THE MARTHA GRAHAM SCHOOL AND DANCE FOUNDATION, INC. and Ronald A. Protas, individually and as Trustee of the Martha Graham Trust Plaintiffs,

v.

MARTHA GRAHAM CENTER OF CONTEMPORARY DANCE, INC. and MARTHA GRAHAM SCHOOL OF CONTEMPORARY DANCE, INC. Defendants,

Eliot Spitzer, Attorney General of the State of New York, Intervenor–Defendant.

No. 01 CIV. 271(MGC).

United States District Court, S.D. New York.

Aug. 23, 2002.

Judd Burstein, P.C., New York, By Judd Burstein, Esq., Sanjit Shah, Esq., Lara Ott, Esq., for Plaintiffs.

Cravath, Swaine & Moore, New York, By Katherine B. Forrest, Esq., Joanne M. Gentile, Esq., Adrienne K. Wheatley, Esq., for Defendants–Counterclaim Plaintiffs Martha Graham Center of Contemporary Dance, Inc. and Martha Graham School of Contemporary Dance, Inc.

Eliot Spitzer, Attorney General of the State of New York, New York, By Marla G. Simpson, Esq., Barbara L. Quint, Esq., for Intervenor–Defendant.

## OPINION

CEDARBAUM, District Judge.

What property did Martha Graham, the great dancer, choreographer, and teacher, own at the time of her death in 1991? That is the central question in the second phase of this lawsuit. The main dispute is with respect to ownership of copyright in the dances she created. That is a federal question. Subsidiary disputes with respect to ownership of the costumes and sets for the dances and fiduciary duties owed by the plaintiff to the defendants are

state law issues that arise from the same nucleus of contested facts.

Between 1956 and her death in 1991, Martha Graham was employed by defendants Martha Graham Center of Contemporary Dance Inc. ("the Center") and Martha Graham School of Contemporary Dance Inc. ("the School"), two not-for-profit corporations that operated as a combined entity. During that 35–year period, Graham created many dances with the members of the Martha Graham Dance Company ("the Dance Company") and the students and teachers at the School, all of whom were employed by the defendants. Prior to 1956, Graham had been the individual proprietor of a dance school.

The parties agree that during her lifetime, Graham created 70 dances that are fixed in a tangible medium of expression from which they can be reproduced.[1] Thirty-four of those 70 dances were created after 1956 ("the post–1956 dances"), during Graham's employment by the defendants, and 36 were created prior to 1956 ("the pre–1956 dances"). Ronald Protas, as legatee under Graham's will, and as trustee of the Martha Graham Trust ("the Trust"), a revocable trust of which he is the creator, trustee, and sole beneficiary, seeks a declaration that he owns copyright in all of the 70 dances. Defendants counterclaim for a declaration that the Center and the School are the true owners of all rights in Graham's choreographic works and related sets, costumes, and other personal property.

Based on a preponderance of the credible evidence, for the reasons that follow, Protas has proved copyright ownership for the renewal term of one dance. Defendants have proved ownership of copyright in 45 of the dances. Ten dances, of which two were commissioned by third parties, are in the public domain. With respect to five dances (two published and three unpublished) which were commissioned, neither side has borne its burden of proving that the commissioning party intended the copyright to be reserved to Graham. Finally, neither side has proved that the remaining nine dances, which were published, were published with the required statutory copyright notice.

Protas also seeks replevin and a declaration of ownership of all Noguchi sets created for the dances at issue and certain items of tangible property.[2] Defendants counterclaim for breach of fiduciary duty by Protas, and seek a constructive trust to recover the proceeds of his licensing of the ballets, sets, and costumes to third parties and of his sale of defendants' property to the Library of Congress. In addition, defendants seek disgorgement of ten years of Protas' salary and of payments made to Protas by defendants under a 1999 license agreement. Defendants also seek the same recovery as damages for counterclaims of fraud and negligent misrepresentation. Finally, defendants counterclaim for replevin of various items of property that Protas currently possesses and assert that Protas owes them money improperly borrowed.

## THE FACTS

During a bench trial held between April 22 and April 29, eighteen witnesses testified in the courtroom and designations from the deposition of one witness were

1. The claims are limited to those 70 dances.

2. Plaintiff has withdrawn the breach of contract claims asserted in the complaint. No evidence was presented at trial with respect to his unjust enrichment claim and his claim that defendants failed to comply with the reporting requirements of section 519 of the New York Not–For–Profit Corporation Law. Therefore, those claims are dismissed.

submitted. This trial was an effort to recapture a history that partially predated the knowledge and memory of the living witnesses. Accordingly, the few ancient documents that were produced became very important guideposts.

Plaintiff called the following witnesses: (1) Francis Mason, who, in 1973 or 1974, became a member and Chairman of the Center's board of directors. After two or three years, he became Chairman Emeritus of the board. In 2001, Mason again became Chairman of the board; (2) Marvin Preston, IV, who has considerable experience in the financial management of companies, and who became Executive Director of the Center in March of 2000; (3) Kevin Rover who was, from 1984 to 1989, an attorney with the firm of Morrison, Cohen, Singer, & Weinstein, counsel to the Martha Graham Center. He joined the Center's board of directors in the late 1980s; (4) Linda Hodes, who first met Graham in 1940 when she went to Graham's studio for a dance lesson, and who was a principal dancer with the Dance Company from the early 1950s until 1964. In 1977, Hodes became Director of the School and Rehearsal Director of the Dance Company. Between the late 1980s and 1992, Hodes was a member of the Center's board of directors. She also had the title of Associate Artistic Director; (5) James McGarry, the attorney who drew Graham's last will in 1989; (6) Lee Traub, who studied with Graham in 1942, was a member of the Center's board of directors from 1974 to 1994 and Chairman of the board for ten years; (7) Jeannette Roosevelt, who served as a member of the Center's board of directors between 1965 or 1966 and 1973, and became President of the Center in 1968; (8) Judith Schlosser, who has been a member of the Center's board of directors since 1974 or 1975; (9) Ronald Protas, the plaintiff, who met Graham in 1967, and who became an employee of the defendants in 1972. By the mid–1970s, Protas had become Executive Director and a board member of the Center and the School. In approximately 1980, he was given the title of Co–Associate Artistic Director; (10) Cynthia Parker–Kaback, who, in 1973, was hired as manager of the Dance Company by Protas and served until 1982; (11) Petek Gunay, an associate in the law office of plaintiff's counsel, who was assigned by counsel to go to the New York Public Library and view videotapes listed in one of defendants' exhibits.

Defendants called the following witnesses: (1) William McHenry, who was a member of the Center's board of directors from 1967 to 1973; (2) Edmund Pease, a certified financial analyst, who was a member of the Center's board of directors between 1974 and 1979. He also served as Treasurer and Vice–President; (3) Christopher Herrmann, who was assistant to the General Director (Protas) in 1987, then Director of Special Events and Projects until 1989, when he left the Center. In 1990, Herrmann returned to the Center as Director of Film Projects; (4) Stuart Hodes, who was a principal dancer with the Dance Company between 1947 and 1958, after which he taught at the School and worked to help the School gain accreditation; (5) Marvin Preston, *see supra;* (6) Terese Capucilli, who was a principal dancer with the Dance Company between 1979 and 1997, Co–Associate Artistic Director from 1997 to 2000, and currently principal dancer, Artistic Coordinator, and teacher at the School; (7) Christine Dakin, a dancer with the Dance Company between 1976 and 2000, who is currently a member of the dance faculty of the defendants; (8) Janet Eilber, who became a principal dancer with the Dance Company in 1972 and danced with the Company throughout the 1970s. She also was a teacher at the

School. In 1998, she was invited to become Artistic Director for the defendants.

After observing the witnesses, evaluating their credibility and weighing all of the evidence, I make the following findings of fact. I incorporate in this opinion the findings of fact stated in my earlier opinion, *The Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F.Supp.2d 512 (S.D.N.Y.2001), *aff'd*, 43 Fed.Appx. 408 (2d Cir.2002). Familiarity with the facts detailed in that opinion is assumed. I will only repeat facts that are of special significance to the claims at issue in this part of the case. After listening to his evasive and inconsistent testimony and observing his demeanor, I again find Protas not to be a credible witness.

Between 1930 and 1956, Graham operated a dance school as a sole proprietorship. Prior to 1956, she created 36 of the dances at issue. She was commissioned by a number of renowned musical and cultural organizations to create seven dances, which were first performed between 1944 and 1953: Appalachian Spring, Herodiade, Dark Meadow, Cave of the Heart, Night Journey, Judith (created in 1950)[3], and Canticle for Innocent Comedians. In 1948, Graham was one of the incorporators of the Martha Graham Foundation for Contemporary Dance ("the Foundation"), a not-for-profit corporation that was renamed the Martha Graham Center of Contemporary Dance in 1968.

In December of 1956, Graham sold the dance school she had been running as a sole proprietorship to the then newly incorporated not-for-profit, Martha Graham School of Contemporary Dance, Inc. The purposes of the School, as stated in its certificate of incorporation were to, *inter alia*, "teach the science and art of the dance," and "in conjunction with the conduct of such school, ... to compose, perform and demonstrate, and to commission the composition, performance and demonstration of dances, ballets, dramas and music ...."

The Center operated as an umbrella organization, encompassing the teaching, choreographing, and performing of dances by the School and the Dance Company. The defendants—the Center and the School—operated as one entity. They were located on the same premises; for many years, they had identical boards of directors which held joint meetings; funds from the Center were used to pay the School's expenses for sets and costumes; and the accounts of the School and Center were combined for auditing purposes.

In December of 1956, when Graham sold her sole proprietorship to the School, she entered into a ten-year employment agreement with the School to serve as "Program Director." Graham's job title later changed to "Artistic Director." There was uniform credible testimony that Graham was an employee of the defendants until her death in 1991. Protas conceded in his testimony that Graham was an employee of the Center. In January 1958, the School submitted a tax protest ("the protest") to Internal Revenue in defense of its previous request for exemption from federal income tax. The protest stated that Graham had "full charge and responsibility for the educational program of the corporation."

Minutes of a combined annual meeting of the School's members and board of directors in June of 1966 show that Graham's employment agreement was ex-

---

**3.** This dance has to be distinguished from another dance named Judith, which is also at issue in this case, and was created in 1980.

tended for another ten years. As Artistic Director, it was her responsibility to create new dances, to maintain the repertory of dances, to rehearse the company, and to supervise the School. Francis Mason, Judith Schlosser, and Lee Traub, members of the Center's board of directors, testified credibly that Graham's responsibilities during her employment included the creation of dances. During the entire period of her employment, the defendants paid her a salary from which they withheld taxes. They paid social security tax for her and also paid for her personal, travel, and medical expenses and other employee benefits.

In January 1957, in the course of developing the School as the center of her "theatre," Graham gave all of her theatrical properties to the School. In this transfer, Graham included 16 complete theatrical sets, most of which had been created by the renowned artist, Isamu Noguchi, the entire costume wardrobe used with the sixteen works, and all her electrical and basic stage equipment. In 1969, Graham donated to the Center a collection of books and various biographical materials which a professional appraiser valued at $2,500.

In 1968, LeRoy Leatherman, Executive Administrator of the Center, denied a request by the director of the Netherlands School to perform the dances created by Graham. In his letter denying the request, Leatherman stated that Graham had assigned all performing rights to the Center. In 1971, Leatherman wrote a letter on behalf of Graham to Linda Hodes, responding to Hodes' request to perform the dances during her time at the Netherlands Dance Theater. He stated in that letter that Graham had "assigned all rights to all of her works to the Martha Graham Center, Inc." LeRoy Leatherman was the principal managerial employee of the defendants and a member of the board of directors of the School from its founding in 1956 to 1972. In January of 1958, as Secretary and Treasurer of the School, he signed the tax protest submitted to Internal Revenue by the School and stated that the information contained in the protest was true to his knowledge, information, and belief. Jeanette Roosevelt, who served as a member of the Center's board of directors from 1965 or 1966 until the end of 1972, and as President of the Center and of the School from 1968, testified credibly that Leatherman was very loyal to Graham and was concerned that her wishes be met. Roosevelt also testified credibly that during the period in which she served on the board, it was the board's understanding that Graham "gave" her works to the Center and that "whenever dances were created, they would become works that the board was responsible for."

In 1974, Edmund Pease, Treasurer and member of the Center's board of directors, with the aid of Lutz and Carr, an accounting firm, undertook "a thorough study" of the commingling of the assets belonging to the Center and to Graham with the purpose of determining what belonged to whom. According to Pease, his examination of documents dating back to 1948 revealed that dance royalties had been paid to the Foundation/Center and that the Center had borne the expense of creating the sets and costumes. The study's final report concluded that the Center's assets included the dances, sets, and costumes, and recommended that these items be carried on the Center's balance sheet as assets at nominal value. Pease personally submitted this report to Graham. She did not express any disagreement with the report's findings. Pease thereafter presented the report to the Center's board of directors while Graham was present. Francis Mason, member and Chairman of the Center's board of directors at that time, testified that the board approved

Pease's report. The report and the board minutes pertaining to this period have been lost or destroyed. Pease was a forthcoming and credible witness at trial.

Ronald Protas first became acquainted with Graham in approximately 1967, when he was a 26–year–old freelance photographer. The two developed a close friendship. Over the years, under Graham's auspices, Protas became an increasingly important figure at the Center. His arrival in 1972 as a Center employee was followed shortly by resignations, requested by Graham, of longstanding members of the board who had personal knowledge of the Center's history. Protas was copied on some of the resignation letters that were received in response to Graham's request. Although he was not a dancer, by the mid–1970s, Protas had become Executive Director of the Center and a board member of the Center and the School. In approximately 1980, he was given the title of Co–Associate Artistic Director.

Protas maintained control over the Center's board minutes and book-keeping by hiring as Center employees individuals who regarded him as the "boss," reported to him, and "accepted his word." In 1973, Protas hired Cynthia Parker–Kaback to serve as a manager for the Dance Company. She remained a Center employee until 1982. Parker–Kaback frequently attended the Center's board meetings and typed the minutes of those meetings. At the first trial, she testified credibly that she gave Protas the minutes for his approval before disseminating them. In addition, Judith Schlosser, a member of the Center's board of directors, testified credibly that the minutes were "usually edited by Mr. Protas."

In 1973, Protas also hired Michele Etienne, who served as the Center's business manager until 1998. On cross-examination at the first trial, Etienne testified that during her employment at the Center, no royalty payments were made to Martha Graham. Although I did not believe much of Etienne's testimony, I do credit her statement that no royalties were paid to Graham by defendants. In spite of that admission, Etienne testified at the first trial that on April 14, 1989, she prepared a memorandum for Protas stating that "[i]n accordance with the Board of Trustees resolution of 1987 Ms. Graham is being paid a royalty of $40,000 per annum for the use of her ballets, her costumes and her Noguchi sets."

Protas had easy access to the Center's funds, and he supervised the Center employees who kept the books. In 1992, Protas "took" $10,000 as a bonus for himself from the Center's funds and later informed Michele Etienne that he had done so. He also borrowed $7,000 and $2,500 on separate occasions from the Center. In addition, in November of 1985, Lutz and Carr, accountants for the Center and School, notified Lee Traub, Chairman of the Center's board of directors, that Protas owed the Center money and that he had "refuse[d] to acknowledge his debt to the Martha Graham Center and School." In December of 1985, Protas wrote to Traub giving examples of what he had spent some of the money on. In explaining that he had spent some of the money on film, video cassettes, and camera equipment, he stated that the "camera equipment ... reamins [sic] the property of the [C]enter," and that "I donate my photographs for the use of the [C]enter."

As Graham's physical abilities waned in the final years of her life, Protas became her spokesperson. Judith Schlosser testified credibly at the first trial that Graham did not attend board meetings regularly between 1987 and 1991 and that the board would learn of her views through Protas:

"Ron Protas would say, Martha wants, or Martha said, or Martha would like."

Although he was a fiduciary of the defendants, Protas was aware of his personal interest and the potentiality of conflict. In June of 1988, Protas wrote to Alex Racolin, a member of the Center's board of directors. In that letter, Protas stated that he "ultimately . . . want[ed]" Rick Burke, a board member, "off the board and friends on, right now the board is tilting in a direction I do not understand and it scares me." In the same letter, Protas wrote: "[f]or now I want to do everything possible to strengthen my position, in terms of [M]artha's will, board people and the sets." Lee Traub, a member of the Center's board of directors, testified credibly that Protas had the "final say" on who could or could not be a board member: "He put them on and took them off."

In June of 1988, Peter Morrison, a member of the Center's board of directors, commenced an investigation into the ownership of Noguchi sets. A mysterious document, entitled "Addendum to the Minutes of the Board of Trustees" for June 23, 1988, a separate page that was not incorporated into the board minutes for that day, states that "[t]he Board unanimously confirmed that all of the sets of Isamu Noguchi were given to Martha Graham, and that if some were credited to the [C]enter's assets, that this was incorrect and would be changed. It was only asked that it be formally implemented through Peter Morrison." It is hard to understand why such a freestanding addendum to the board minutes was necessary. All drafts of minutes, however, were edited by Protas before they were circulated.

When Morrison fell ill, Kevin Rover, a member of the Center's board, took over the investigation. Rover testified credibly that he was not shown numerous documents pertaining to the ownership of the sets and costumes, including, in particular, documents referring to Graham's 1957 transfer of all theatrical properties to the School. Evidence admitted at the first trial shows that Protas wrote Rover a letter stating that:

> As we discussed last evening I feel the best way to go forward immediately is to accept Martha's offer to allow the use of the Herodiade set to be used as a loan at Sotheby. The ballet was done in 1944, long before the School or Company [w]as incorporated; so there should be no Rick Burke problem.

Protas then attached the letter addressed to Rover to another letter that he sent to Michael Stout, an attorney, in connection with using some pieces from the Noguchi sets as collateral for a loan from Sotheby's. In the letter to Stout, Protas stated that: "I sent the attached note to Kevin Rover who said there was no problem stating Martha owned her sets prior to 1949. If we could go forward on this with Sotheby's it would be a godsend."

Also admitted at the previous trial was a letter to Protas from Rick Burke, President of the Center and a member of the board of directors. That letter stated:

> As far as the art is concerned, it concerned me that last year you attempted to move the art from the Center back to Martha and the Board delay [sic] a decision until we had legal advice which we never acted on. I did talk to Peter who stated flately [sic] that all the art was owned by the Center to protect them from inheretance [sic] taxes and give the Center the necessary assets to finance the company. Your action without talking to me, concerned me and other members of the Board. No one disputes you run the show and deserve what ever Martha wants to give you.

Based on his limited information, on July 18, 1989, Rover announced to the board of directors that in his opinion, "the financial records indicated no grounds for ownership by the Center, and that Ron had acted within the scope of his authority as General Director of the Martha Graham Center." The board then adopted resolutions "recognizing Martha Graham as owner of the Noguchi sets and jewelry" and "ratif[ying] actions undertaken by Protas to secure loans from Sotheby's" while using six Noguchi sculptures as collateral. On June 21, 1989, Protas wrote to Sotheby's to confirm that the Center consented to Sotheby's loan on April 26, 1989 of $200,000 to Graham and that the Center also consented to an additional loan of $475,000 by Sotheby's to Graham.

In June of 1990, the board authorized the Center to accept six Noguchi sculptures (3 Herodiade sculptures, Lyre, Cave of the Heart and Wood Sculpture of a Horse) as a gift from Graham, subject to her right to purchase these sculptures within the five-year period immediately following the date of her gift. The board also resolved that the Center would sell these sculptures to the J.M. Kaplan Fund for $600,000, subject to the Center's right to purchase the sculptures during the subsequent five years. In June 1990, Sotheby's released its security interest in the six sculptures, and the Center assigned all of its rights in the sculptures to the J.M. Kaplan Fund subject to an option to purchase the sculptures within five years.

Martha Graham died in April of 1991. Her last will, executed on January 19, 1989, named Protas as sole executor and legatee, but did not specify what she owned at the time of her death. James McGarry, the attorney who drew that will, testified credibly at the first trial that he prepared it in "no more than an hour, a will of that type." He also testified that he was not asked to conduct an investigation as to what intellectual property, costumes, and sets Graham owned at that time, and that he did not conduct such an investigation. The will contains the following language:

The residue ... of all my property, real and personal, of every kind and description and wherever situated, including all property over which I may have power of appointment at the time of my death ... and including all property not otherwise effectively disposed of hereunder ... I give, devise and bequeath to my said friend, Ron Protas, if he shall survive me, or, if he shall not survive me, to the Martha Graham Center of Contemporary Dance, Inc.

In connection with any rights or interests in any dance works, musical scores, scenery sets, my personal papers and the use of my name, which may pass to my said friend Ron Protas ... I request, but do not enjoin, that he consult with my friends, Linda Hodes, Diane Gray, Halston, Ted Michaelson, Alex Racolin and Lee Traub, regarding the use of such rights or interests.

After Graham's death, Protas succeeded her as Artistic Director of the Center and the School, and continued to serve as a member of the Center's board of directors. In 1992, attorneys who represented Protas as executor of Graham's estate recommended to him that "an investigation be made as to what rights the Estate actually owns and the status of copyright registrations, if any ...." Protas made no such investigation. I did not credit Protas' testimony at the first trial that he told Alex Racolin, a member of the Center's board of directors who is now deceased, of his attorneys' recommendations, and that he was "almost a 100 percent sure that [Racolin] mentioned it at a board meeting to the other board members." There are no

board minutes which show that such a discussion took place.

Protas represented to the directors of the Center that he "owned everything" including the Noguchi sets and the copyrights in all the dances. The board members accepted Protas' representations because, as Francis Mason, the current chairman of the Center's board of directors, and a very credible witness, testified, "[w]e trusted Mr. Protas." The only evidence of a communication from Protas to Racolin after Graham's death is a letter that Protas wrote dated 29th August, 1991 that made it appear that Graham, and not the Center, owned the ballets, sets, costumes, and dance films.

In that letter, admitted at the first trial, Protas stated that:

I spoke with Chris about the information of the use of the ballets, costumes and sets for the Center. Since Michele is on holiday, I have asked her assistant, Adrienne, to look for all relevant information.

I have a clear recollection that at a board meeting there was a resolution that for the use of the ballets, costumes and sets for performances of the Martha Graham Dance Company, the Center would pay Martha a royalty of $100,000 beyond her ordinary salary.

To my knowledge, there was never an actual agreement or signed contract and past history always had the Center paying Martha a separate royalty for the use of the ballets in a film. I was concerned about this myself and somewhere, if I can ever find it, is a letter from Martha stating, or clarifying, that the films or the use of the Noguchi's [sic] had to be a separate arrangement. In regard to the Noguchi castings, it was left to Martha and I to decide what, if anything, we would give to the Center and everyone was very grateful when

Kevin Rover and I worked out a contract giving the Center 40% of the income. I don't know if I want to keep this arrangement in all instances. I would like to keep that option open. I know in the two films made for PBS over 15 years ago, Martha was paid a separate royalty by PBS. It could have been higher but she chose to have most of the funds for the films go to the Center, at that time.

In regard to the NHK Japanese Film and the Danish Film, it was my understanding that Martha allowed the use of the choreography only for the Danish American Showing, and only for the showing of the Japanese Film in Japan. Everything else was left for a separate arrangement which was agreeable to Kevin.

I realize now I should have been clear about all of this. There is some background correspondence but I will have to do an all out search for it if it is really necessary. My feeling is that no one on the Board would object to an equitable arrangement. Of course one man's equity is another man's etc . . .

I know that at the time of the resolution it was understood that it was only for the Company to perform the ballets live, and tour with them. Film deals, cassettes and all the rest were never considered part of the agreement. . . .

. . . .

P.S. I am not delaying this fax any longer. I had hoped Adrienne would find the relevant materials, but she could not.

There is no evidence of any "background correspondence" that corroborated any of what Protas stated in his letter to Racolin. Indeed, as he noted in his letter, Etienne's assistant could not find "the relevant materials." Many of Protas' statements to Ra-

colin in that letter were inaccurate or misleading. His statements regarding the payment of royalties by the Center to Graham were inaccurate. As noted above, Michele Etienne testified credibly that during her employment at the Center, no royalty payments were made to Martha Graham. At the time that Protas wrote the letter to Racolin, he had been the principal managerial employee of the defendants for nearly two decades. It is surprising that he was unaware that no royalties had been paid to Graham by the Center.

Protas' statements to Racolin implying that the defendants had no rights in the films and that "it was only for the Company to perform the ballets live" were misleading. In 1973, Protas himself negotiated a contract pertaining to dance films, retaining "all rights" for the Center, and wrote a letter to Arnold Weissberger stating that:

> I am making arrangements to have a work film made of "Clytemnestra" and "Secular Games", "Myth of a Voyage" and "Mendicants of the Evening". I would be grateful if we could draw up a contract between the Center and the photographer, Mr. Nathaniel Tripp, stating that we retain all rights to these films and that he has no authority to make duplicates of them.

Furthermore, Protas had personal knowledge that it was the Center, and not Graham, that received royalties from PBS for at least one film. Minutes of the Center's board of directors' meeting for October 18, 1984 state:

> Ron Protas then detailed to the Board the extraordinary filming deal Jim Nomikos had made in Denmark. The Center nows [sic] owns the 90 minute film of the three ballets—"Cave of the Heart", "Errand into the Maze", and "Acts of Light"—which it will sell to PBS for $100,000 and possibly to various European countries.... Ron thanked the Board saying that without their support the deal could never have been made.

The board minutes for December 11, 1984 state:

> Lee Traub asked how much money had been received from the PBS film; Jim said that it was $100,000. Jim Nomikos also said that because the Center now owned the film and all the rights, it could now sell the broadcast rights and also, possibly, videocassettes around the world. The film could, therefore, generate several hundred thousand dollars income for the Center. The deal was significantly different than all previous film deals the Center had been involved in where it received a fixed fee and no percentage of film sales/broadcast rights.
>
> Ron Protas added the ... most extraordinary thing about the deal was that Jim Nomikos had sensed that the original NVC deal (where the Center would receive only a fee) was not best for the Center ....

The other PBS film that was produced prior to 1984 was "3 by Martha Graham." That film was published in 1969 with notice of the Center's copyright, and the credits at the end of the film list Protas' name for "still photographs." A preponderance of the credible evidence shows that the Center owned all the rights in this film and in the works contained therein and received royalties from licensing this film. William McHenry, a member of the Center's board of directors, testified credibly that in 1969 or 1970, he had negotiated on behalf of the Center the licensing of this film to "N.E.T.," now known as PBS. In a 1969 letter addressed to N.E.T. and copied to Leatherman, McHenry stated that "[i]n the United States we reserve film rights for all uses; outside the United States we

are to have all rights." In 1970, Leatherman, on behalf of the Center, executed a license agreement that assured to the Center 25 percent of all gross proceeds in connection with the sale and/or disposition of prints of the film.

With respect to the NHK film, Protas stated to Racolin that "it is my understanding that Martha allowed the use of the choreography only for the Danish American Showing, and only for the showing of the Japanese Film in Japan." Contrary to Protas' "understanding," in September of 1990, the Center entered into an agreement with NHK with respect to two taped dance performances. Protas, as General Director, represented the Center in that agreement. The agreement stated that the Center retained "all broadcast rights outside of Japan," and "the rights to perform" the two dance programs.

In November of 1993, Protas assigned to the Center forty percent of his interest in the Isamu Noguchi sculpture entitled "Herodiade." The ballet Herodiade was created by Graham in 1944. The sets for Herodiade were donated to the School by Graham in 1957 along with other Noguchi sets and theatrical properties.

In April of 1998, on behalf of his personal Trust, Protas entered into an agreement with the Library of Congress for the sale of a collection of various items for the price of $500,000 to be paid in five annual installments. This collection contained scrapbooks, photographs, films, videos, files, letters, programs and notebooks.[4] The Center's business and student records were among the items sold. Protas testified that at the time that he entered into the agreement with the Library of Congress, he did not know that Graham had donated many of her books and biographical materials to the Center in 1969.

In the late 1990s, relations between Protas and other members of the defendants' board of directors deteriorated. On July 15, 1999, with the principal motive of persuading Protas to resign as Artistic Director, the Center and the School entered into a ten-year license agreement with the Martha Graham Trust. The license agreement purported to license the ballets, sets, and costumes to the defendants. It contained the following language:

> The Trust grants the Center a non-exclusive live performance license to the Martha Graham Ballets (MG Works) specified on the Applicable Works Addendum (Works Addendum). MG works listed within the section of the Works Addendum titled "Company Works" are licensed for performance by the Martha Graham Dance Company ("Company."). MG Works listed within the section of the Works Addendum titled "Ensemble Works" are licensed for performance by the Ensemble of the Martha Graham School of Contemporary Dance ("Ensemble") . . . .
>
> . . . .
>
> The Trust grants the Center a non-exclusive use license to the Martha Graham Scenic, Costume and Properties Collection ("Collection") for performances, by the Company, Ensemble and School of MG Works licensed herein . . . .

---

4. Among the items sold to the Library of Congress were: (1) nine file cabinets containing financial and business records from the 1980s to the 1990s, seven file drawers of student records, and other items, priced at $85,000; (2) 35–40 scrapbooks from the 1950s to the 1970s priced at $7,500; (3) about 300 video tapes and 500 audio tapes of dances and about fifty original films; 2–300 audio tapes ("Blood Memory") priced at $50,000; (4) two boxes of business and financial records priced at $2,000; (5) musical manuscripts for the dances, priced at $25,000; and (6) dozens of audio and video tapes and one large box of audio tapes, priced at $3,500.

. . . .

> To the extent that any rights to any . . . MG Work is deemed hereafter to accrue to the Center, the School, Company or Ensemble, the Center assigns any or all such rights at such time as they may be deemed to accrue . . . to the Trust. . . .

The "Works Addendum," which was supposed to contain a list of dances for which the Center was granted a non-exclusive live performance license, was never completed or signed.

In 2000, Marvin Preston, the current Executive Director of the Center who has considerable experience in the financial management of companies, undertook a financial assessment of the defendants based on several years of audited financial statements, payroll records, general ledgers, budgets, and other operational documents. He testified credibly that the defendants' profit and loss accounts revealed expenses related to the sets and costumes from which it could be inferred that the sets and costumes were the assets of the defendants.

On May 25, 2000, Protas sent a letter to Francis Mason, the Acting Chairman of the Center's board of directors, terminating the license agreement "effective 12:01 AM EDT on May 26, 2000." On June 22, 2000, the Center's board voted to remove Protas from the board of directors. In July of 2000, Protas began to apply to register copyright in 40 of Graham's choreographic works as unpublished works and obtained certificates of copyright registration for 30 of the works at issue.

The Center began to apply for copyright registration of 15 dances in January 2001. It obtained certificates of copyright registration for 12 dances and certificates of copyright renewal for three dances, Seraphic Dialogue, Cortege of Eagles, and Acrobats of God, as published in the film "3 by Martha Graham." The parties have competing certificates of copyright registration for eight works, three of which are unpublished.

Five reliable documents show that films of 26 dances, 16 of which were created by Graham prior to 1956 and ten of which were created after 1956, have been distributed to the public for money, i.e., published within the meaning of both the 1909 and the 1976 Copyright Acts. The 16 pre–1956 published dances and their years of first publication are: Flute of Krishna (1923), Heretic (1930), Lamentation (1930), Celebration (1934), Frontier (1935), Panorama (1935), Chronicle/Steps in the Street (1936), American Document (1938), El Penitente (1991), Herodiade (1991), Appalachian Spring (1959), Cave of the Heart (1976), Errand into the Maze (1984), Night Journey (1960), Diversion of Angels (1976), and Seraphic Dialogue (1969). The ten post–1956 published dances and their years of first publication are: Clytemnestra (1979), Acrobats of God (1969), Circe (published before 1993), Cortege of Eagles (1969), Adorations (1976), Acts of Light (1984), The Rite of Spring (published before 1993), Temptations of the Moon (published before 1993), Night Chant (published before 1993), and Maple Leaf Rag (1991).

The five documents contain overlapping lists of published dances. While the first two documents described below suffice to show that 26 dances have been published, publication of many of the films contained in those two documents is confirmed by three additional documents. The first document, admitted into evidence "in its entirety," i.e., for all purposes, is a list prepared by Christina Duda, Protas' assistant, of 21 ballets that have been "filmed and sold." In February of 1993, after his attorney sought information on publication with a view to applying to the Copyright Office for registration of copyright in chor-

eography, Protas was specifically informed by his Duda that the following 21 dances had been "filmed and sold": Frontier, Panorama, Chronicle/Steps in the Street, American Document, El Penitente, Herodiade, Appalachian Spring, Cave of the Heart, Errand into the Maze, Night Journey, Diversion of Angels, Seraphic Dialogue, Clytemnestra, Acrobats of God, Circe, Cortege of Eagles, Acts of Light, The Rite of Spring, Temptations of the Moon, Night Chant, and Maple Leaf Rag. Christopher Herrmann, Director of Film Projects at the Center, testified credibly that films of those 21 dances were "made available to the public for money." He also testified that the School ran a boutique that sold videotapes of Graham's dances. Despite his knowledge that these 21 films had been published, beginning in July of 2000, Protas applied to register 19 of the 21 dances as unpublished works and obtained certificates of copyright registration for 15 of them.

Another document prepared by Christopher Herrmann in 1990 contains a list of 19 "commercially produced" films. These 19 films and their dates of publication are: Flute of Krishna (1923), Heretic (1930), Lamentation (1930, 1943, and 1976), Celebration (1934), Frontier (1935 and 1976), Panorama (1935), Chronicle/Steps in the Street (1936), American Document (1938), Appalachian Spring (1959 and 1976), Cave of the Heart (1976 and 1984), Errand into the Maze (1984), Night Journey (1960), Diversion of Angels (1976), Seraphic Dialogue (1969), Clytemnestra (1979), Acrobats of God (1969), Cortege of Eagles (1969), Adorations (1976), and Acts of Light (1984).[5] Most of the dances in the list of commercially produced films are also contained in the list of dances that were filmed and sold.

Among the commercially produced films, Seraphic Dialogue, Acrobats of God, and Cortege of Eagles are listed together as works distributed in 1969 and available from "Pyramid Films." A "Pyramid Home Video" videocassette of "3 by Martha Graham" was received in evidence. This videocassette carries a 1969 notice of copyright in the Center's name on its cover and at the end of the film. Furthermore, in a June 1, 2001 letter, the Copyright Office told Protas' attorney that " '3 by Martha Graham' was ... first published in 1969 or 1970 and was subsequently released by Pyramid Home Video. The videotape is now widely available ...." New York Public Library records also show that "3 by Martha Graham" was produced by the Center in 1969 and released in 1970, and that this film's distributor was "Pyramid Film & Video." In addition, Francis Mason testified credibly that this film was available for sale.

A 1991 letter introduced by Protas for the purpose of showing that Martha Graham received royalties for "film distribution through Phoenix Films" establishes that two dances, Appalachian Spring and Night Journey, which also appear in both of the aforementioned lists, were being distributed in about 1961.[6] Christopher Herrmann testified credibly that the dance films distributed by "Phoenix Films" were available in video stores. The fourth document, contained in the catalog of the New York Public Library, shows that seven of the 26 published dances were rented or

---

5. A Dancer's World, which is not among the 70 dances at issue, is also mentioned as being "commercially produced" in 1956 by "Phoenix Films."

6. A third dance, A Dancer's World, is also listed in this document as a dance that was also distributed by Phoenix Films in about 1961. It is not, however, among the 70 dances at issue.

sold prior to 1975.[7] The seven dances are: Flute of Krishna, Lamentation, Appalachian Spring, Night Journey, Seraphic Dialogue, Acrobats of God, and Cortege of Eagles.

Fifth, a June 1, 2001 letter from the Copyright Office to Protas' attorney raised serious questions regarding the publication status of many of the 26 published dances. It also noted that publication of 11 dances which Protas had previously registered as unpublished works was "certain or likely": Frontier, Lamentation, El Penitente, Herodiade, Appalachian Spring, Cave of the Heart, Night Journey, Diversion of Angels, Acrobats of God, Cortege of Eagles, and Maple Leaf Rag. The letter listed multiple ways in which many of the works had been published. In particular, it stated that El Penitente, Maple Leaf Rag, and Herodiade were certain or likely to have been published in 1991 in "Five Dances by Martha Graham," a film that was "commercially available from several on-line sources." The Copyright Office also noted that publication of Seraphic Dialogue, Adoration, and Chronicle/Steps in the Street, for which Protas' copyright applications were then pending, was certain or likely.

The Copyright Office requested comments from Protas regarding the publication status of each of those 14 works and underscored its request with the following words:

Please be aware that the question of publication is extremely important to a copyright registration as it affects the deposit copy, copyright notice requirements, and even how a court might view the facts given on a particular registration. In light of the seriousness of this subject, we would appreciate your thorough research in this area concerning both current claims and those already registered so that the most accurate claims possible might be put on record.

In the same letter, based on Protas' attorney's previous response to its specific query regarding the publication status of Clytemnestra, the Copyright Office advised that Protas' application for Clytemnestra as an "unpublished work" would be processed. Clytemnestra is on the list of 21 published works to which Protas was privy in February of 1993.

Protas applied to register copyright in the choreography of Seraphic Dialogue, Cortege of Eagles and Acrobats of God. As discussed above, these three dances were published in 1969 in the film "3 by Martha Graham" with a 1969 notice of copyright in the Center's name. Protas' own name appeared in the credits of this film as one of the two individuals responsible for "still photographs." Yet, he represented to the Copyright Office that these were unpublished works.

In a letter dated February 23, 2001, in response to the Copyright Office's request for clarification, Protas' attorney stated that "the deposit copy [for Seraphic Dialogue] is from a 'published' videotape made available in 1992." Had Protas submitted the first published film of Seraphic Dialogue in accordance with the Copyright Office's deposit requirements, he could not have concealed the 1969 notice of copyright in the Center's name. Protas testified that he had seen "some of" this film with Graham in 1969 or 1970 "when it was first made," but that he did not see the notice of copyright.

## DISCUSSION

The copyright claims in this case have to be assessed through the prism of the

---

7. An eighth dance on this list, A Dancer's World, is not among the 70 dances at issue in this case.

changes in the copyright law that took effect in 1978, 1989, and 1992. *See* Copyright Act of 1909 ("1909 Act"), 17 U.S.C. § 1 *et seq.* (1976 ed.) (superseded by the Copyright Act of 1976); Copyright Act of 1976 ("1976 Act"), 17 U.S.C. § 101 *et. seq.* (effective Jan. 1, 1978); The Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853 (1988) (effective March 1, 1989); The Copyright Renewal Act of 1992, Pub.L. No. 102–307 § 101, 106 Stat. 264 (June 26, 1992) (applying to the renewal of works which secured statutory copyright between January 1, 1964 and December 31, 1977). The chronology of creation, publication, and copyright registration and renewal of the choreography of each dance is critical to a determination of copyright ownership.

### I. The License Agreement

■ Plaintiff takes the position that defendants have no rights in the ballets since the 1999 license agreement that they signed with the Trust specifically provided that all licenses granted thereunder reverted to the Trust upon the contract's termination. Furthermore, plaintiff argues that the doctrine of licensee estoppel bars defendants from claiming ownership of the ballets, sets, and costumes.

The license agreement provided that:

The Trust grants the Center a non-exclusive live performance license to the Martha Graham Ballets (MG Works) specified on the Applicable Works Addendum (Works Addendum). MG works listed within the section of the Works Addendum titled "Company Works" are licensed for performance by the Martha Graham Dance Company ("Company"). MG Works listed within the section of the Works Addendum titled "Ensemble Works" are licensed for performance by the Ensemble of the Martha Graham School of Contemporary Dance ("Ensemble").

This agreement is incomplete because no "Applicable Works Addendum" was ever finalized by Protas. No addendum was ever signed. Accordingly, the copyright provisions of the license agreement never took effect. Moreover, a license agreement that never took effect cannot provide the foundation for plaintiff's claim of licensee estoppel.

### II. Significance of Publication

■ There is clear and persuasive evidence that films of 16 of the pre–1956 works and ten of the post–1956 works were "commercially produced" and/or "filmed and sold." Seven of these 26 works were also "rented or sold," and two were distributed by Phoenix Films.

The 1909 Act did not define "publication," but the Second Circuit has defined the term: "[P]ublication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public." *Shoptalk, Ltd. v. Concorde–New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir.1999) (quoting *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 945 (2d Cir.1975)).

The 1976 Act defines publication in very similar terms:

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer or ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101. *See Agee v. Paramount Communications Inc.*, 59 F.3d 317, 325 (2d Cir.1995).

Sale, rental, and distribution of films for money all constitute "publication" under both the 1909 and the 1976 Acts. The term "commercially produced" means that the films were produced and introduced into commerce for money, through sale, lease, or rental. Accordingly, 26 of the dances have been published.

 Both plaintiff and defendants agree that to establish ownership of copyright in a published work, a claimant must show that the work was published with adequate notice of copyright. Proof of authorship may be sufficient to establish copyright ownership in an unpublished work. With respect to a published work, however, the claimant has the burden of showing that the work was published in compliance with statutory formalities, and in particular, that it carried the requisite copyright notice.

It is well established that "[t]o show ownership of a valid copyright, [the party claiming copyright ownership] ... bears the burden of proving ... that he has complied with the requisite statutory formalities." *Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc.,* 119 F.3d 55, 59 (1st Cir.1997); *see Geoscan, Inc. of Texas v. Geotrace Tech., Inc.* 226 F.3d 387, 393 (5th Cir.2000); *Montgomery v. Noga,* 168 F.3d 1282, 1289 (11th Cir.1999). *See also Broadcast Music, Inc. v. Patsal Corp.,* 1993 WL 464689, at *4 (S.D.N.Y.1993); *Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Servs.,* 746 F.Supp. 320, 328 n. 7 (S.D.N.Y.1990).

With respect to published works, the affixation of adequate notice was the principal "statutory formality" required for copyright protection prior to March 1, 1989. On March 1, 1989, United States adherence to the Berne Convention abolished affixation of notice as a statutory requirement for securing copyright. The Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853 § 7 (1988) (effective March 1, 1989); 17 U.S.C. § 401(a) ("[A] notice of copyright *may* be placed on publicly distributed copies ....") (emphasis added). But works published prior to March 1, 1989 did not secure statutory copyright protection unless adequate copyright notice was affixed to the published copies. 17 U.S.C. § 10 (1976 ed.) ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright ..."); 17 U.S.C. § 405(a) (stating notice requirements for works published before the effective date of the Berne Convention Implementation Act of 1988).

### III. Certificates of Copyright Registration

Both sides have procured certificates of copyright in dances described in the applications as unpublished works. Protas has 30[8] such certificates, and defendants 12. Defendants have also obtained certificates of copyright renewal for three dances described as published works.

The 1976 Copyright Act, 17 U.S.C. § 410(c) provides that:

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

8. An additional certificate of copyright registration introduced by Protas is for a "drama" entitled "An Act of Becoming." The certificate states that Protas is the author of the work. Accordingly, this certificate has no significance in this dispute.

It is undisputed that the Copyright Office has no record of any copyright registration made prior to 2000 for any of the dances at issue. In 2000 and 2001, Protas obtained certificates of copyright registration for 30 dances as unpublished works. Of these 30 certificates, 17 are for pre–1956 works: Flute of Krishna, Tanagra, Heretic, Lamentation, Primitive Mysteries, Satyric Festival Song, Frontier, Deep Song, Every Soul is a Circus, El Penitente, Punch and the Judy, Herodiade, Appalachian Spring, Cave of the Heart, Errand into the Maze, Night Journey, and Diversion of Angels. The remaining 13 certificates are for post–1956 works: Embattled Garden, Acrobats of God, Phaedra, Circe, Cortege of Eagles, The Owl and the Pussycat, Judith, Phaedra's Dream, The Rite of Spring, Tangled Night, Temptations of the Moon, Night Chant, and Maple Leaf Rag.[9]

A preponderance of the credible evidence shows that 18 of the 30 dances registered by Protas as unpublished had been published at least seven years before the Copyright Office received any applications for copyright registration from him. Those 18 dances are: Flute of Krishna, Heretic, Lamentation, Frontier, El Penitente, Appalachian Spring, Herodiade, Cave of the Heart, Night Journey, Errand into the Maze, Diversion of Angels, Acrobats of God, Circe, Cortege of Eagles, The Rite of Spring, Temptations of the Moon, Night Chant, and Maple Leaf Rag. Accordingly, Protas' certificates of registration for these 18 works do not constitute prima facie evidence of the validity of the copyrights or of the facts stated in the certificates. 17 U.S.C. § 410(c).

Moreover, the evidence is clear and convincing that Protas procured 15 of these certificates by deliberately misrepresenting the publication status of the dances. Those dances are: Frontier, El Penitente, Errand into the Maze, Herodiade, Appalachian Spring, Cave of the Heart, Night Journey, Diversion of Angels, Acrobats of God, Circe, Cortege of Eagles, The Rite of Spring, Temptations of the Moon, Night Chant, and Maple Leaf Rag. By February 1993, Protas knew that those 15 dances had been published. Yet, more than five years later, he applied for and obtained certificates of copyright registration for the choreography of these dances as unpublished works. Protas' representations to the Copyright Office that those 15 dances were unpublished constitute "deliberate misrepresentation." *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 455 (2d Cir.1989).

Particularly egregious were Protas' representations to the Copyright Office that Cortege of Eagles, Acrobats of God, and Seraphic Dialogue were unpublished works. Protas' own name appears on the credits of the film "3 by Martha Graham," in which these three dances were published with a 1969 notice of copyright in the name of the Martha Graham Center of Contemporary Dance. He testified also that close to the time it was made, he saw this film with Graham. Nevertheless, Protas applied for and obtained certificates of copyright registration for Acrobats of God and Cortege of Eagles as unpublished works. When, in October 2000, the Copyright Office inquired about the publication status of Seraphic Dialogue, Protas' attorney responded in February of 2001 that he had "investigated the matter further," and that the deposit copy for Seraphic Dia-

---

**9.** There are a few discrepancies in the dates of creation as contained in a document entitled "The Martha Graham Repertoire" ("the Repertoire") and the dates of creation as stated in Protas' certificates of copyright registration. Both parties have agreed to be bound by the chronological list of dances contained in the Repertoire.

logue was "from a 'published' videotape, made available in 1992." Protas' application for registration of copyright in Seraphic Dialogue is still pending.

In 2001, the Center obtained certificates of copyright registration for 12 post–1956 works as unpublished works made for hire and certificates of copyright renewal for three published works made for hire. The 12 dances are: Embattled Garden, Phaedra, Secular Games, Circe, The Witch of Endor, Plain of Prayer, Lucifer, O Thou Desire Who Art About to Sing, Temptations of the Moon, Tangled Night, Night Chant, and The Eyes of the Goddess. The Center's copyright certificates for three of these dances, Circe, Temptations of the Moon, and Night Chant, do not constitute prima evidence of copyright validity because those dances were published more than five years prior to registration.

In 2001, the Center also obtained certificates of copyright renewal for three dances, Cortege of Eagles, Acrobats of God, and Seraphic Dialogue, as published works contained in the film "3 by Martha Graham." Seraphic Dialogue was created prior to 1956 and the other two dances were created during Graham's employment with the defendants. All three dances are registered as works that were published in 1969 with notice of the Center's copyright. With respect to the prima facie validity of copyright renewal certificates, 17 U.S.C. § 304(a)(4)(B) provides that:

> If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1–year period shall be within the discretion of the court.

Since statutory copyright was secured in these three works in 1969, it is clear that the applications for renewal of copyright in these three works were not made in the final year of their original term of copyright protection. Accordingly, the Center's renewal certificates do not constitute prima facie evidence of copyright validity.

Finally, both Protas and the Center have obtained certificates of copyright registration for the following eight dances: Embattled Garden, Acrobats of God, Phaedra, Circe, Cortege of Eagles, Temptations of the Moon, Tangled Night, and Night Chant. In acknowledging some of these competing certificates of registration, the Copyright Office has specifically stated that:

> The Copyright Office is an office of record and it does not have the authority to adjudicate adverse or conflicting claims submitted for registration. Each claim is examined to determine if it complies with statutory and regulatory requirements; if it does, it is registered. When conflicting claims are received, the Office may put both claims on record if each is acceptable on its own merits. It is the responsibility of the parties involved in a dispute to pursue their rights in their works.

Neither side is entitled to a presumption of copyright validity for those competing certificates of registration. *See M & D Int'l Corp. v. Chan,* 901 F.Supp. 1502, 1510 (D.Hawai'i 1995) ("[I]t might be argued that the plaintiff's and defendant's certificates cancel each other out with respect to either party's right to claim a prima facie presumption ....") (quoting Nimmer on Copyright, § 12.11[B] at 12–166 n. 49); *see*

*also Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (not addressing the prima facie validity of registrations where both parties had "filed competing copyright registration certificates").

With respect to dances as to which there is no evidence of publication, plaintiff has obtained nine, and defendants have obtained six, non-competing certificates of copyright registration. Thus, plaintiff has presented prima facie evidence of ownership of copyright in the following unpublished works: Tanagra, Primitive Mysteries, Satyric Festival Song, Deep Song, Every Soul is a Circus, Punch and the Judy, The Owl and the Pussycat, Judith (created in 1980), and Phaedra's Dream. Defendants have presented prima facie evidence of ownership of copyright in the following unpublished works: Secular Games, The Witch of Endor, Plain of Prayer, Lucifer, O Thou Desire Who Art About to Sing, and The Eyes of the Goddess.

## IV. Dances Created by Graham During the 35 Years that She Was Employed by Defendants

During the 35 years that Martha Graham was employed by the defendants, she created 34 dances. Those 34 works are: Clytemnestra, Embattled Garden, Episodes: Part I, Acrobats of God, Phaedra, Secular Games, Legend of Judith, Circe, The Witch of Endor, Part Real–Part Dream, Cortege of Eagles, Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Lucifer, The Scarlet Letter, Adorations, O Thou Desire Who Art About to Sing, Shadows, The Owl and the Pussycat, Ecuatorial, Frescoes, Judith, Acts of Light, Andromache's Lament, Phaedra's Dream, The Rite of Spring, Song, Temptations of the Moon, Tangled Night, Persephone, Night Chant, Maple Leaf Rag, and The Eyes of the Goddess. Of the 34 post–1956 dances, ten have been published: Clytemnestra, Acrobats of God, Circe, Cortege of Eagles, Adorations, Acts of Light, The Rite of Spring, Temptations of the Moon, Night Chant and Maple Leaf Rag. Plaintiff holds certificates of copyright registration for three unpublished post–1956 works, The Owl and the Pussycat, Judith, and Phaedra's Dream.

Plaintiff argues that, as Graham's heir, he owns the copyright in all of the 34 dances because she was the creator of these works. Defendants argue that copyright in all of the post–1956 works belongs to them as works made for hire.

## Works Made for Hire

Of the 34 post–1956 works, the 19 ballets created before January 1, 1978, the effective date of the Copyright Act of 1976, are governed by the Copyright Act of 1909, and the 15 ballets created after that date are governed by the 1976 Act.

## Works Made for Hire under the 1909 Act

The common law doctrine of works made for hire was first recognized by the Supreme Court in *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903), and later codified in the 1909 Act. *Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,* 369 F.2d 565, 567 (2d Cir.1966). In *Bleistein,* the Supreme Court noted that "[t]here was evidence warranting the inference" that chromolithographs prepared by the plaintiff's employees "belonged to the plaintiff, they having been produced by persons employed and paid by the plaintiffs in their establishment to make those very things." *Bleistein,* 188 U.S. at 248, 23 S.Ct. 298. The 1909 Act states that "[i]n the interpretation and construction of this title . . . the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (1976 ed.).

"Until the mid–1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work." *Playboy*, 53 F.3d at 554, (citing *Reid*, 490 U.S. at 749, 109 S.Ct. 2166). *See e.g., Yale Univ. Press v. Row, Peterson & Co.*, 40 F.2d 290, 291 (S.D.N.Y.1930) (recognizing the basis of employer's copyright suit under the 1909 Act, pursuant to which an employer may be deemed the author of works made for hire); *Nat'l Cloak & Suit Co. v. Kaufman*, 189 F. 215, 217 (C.C.M.D.Pa.1911) (holding that employer had the right to the copyright in the literary product of a salaried employee under the 1909 Act). In *Brattleboro*, the Second Circuit noted that the works made for hire doctrine was "applicable whenever an employee's work is produced at the instance and expense of his employer. In such circumstances, the employer has been presumed to have the copyright." The court "[saw] no sound reason why these same principles [were] not applicable when the parties bear the relationship of employer and independent contractor." *Brattleboro*, 369 F.2d at 568. It held that where the intent of the parties could not be determined, the presumption of copyright ownership ran in favor of the employer. *Id.*

Since then, the Second Circuit has "defined the 'instance and expense' test as being met 'when the motivating factor in producing the work was the employer who induced the creation.'" *Playboy*, 53 F.3d at 554 (quoting *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir.1974)). That court has also held that "an essential element of the employer-employee relationship, [is] the right of the employer to direct and supervise the manner in which the writer performs his work." *Id.* (quoting *Picture Music, Inc. v. Bourne Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972)).

**At the Expense of the Employer**

A preponderance of the credible evidence shows that Martha Graham's dances were created at the expense of the Center, which operated as an umbrella organization for the Dance Company and the School. In February 1968, LeRoy Leatherman, the Executive Administrator of the Foundation, addressed a memorandum to Foundation and School board members regarding the establishment of the Center. In this memorandum, he recognized that "the [C]enter comprising the School [and] the Company ... already exist[ed]" and that it would "continue all present activities, including teaching, choreographing and performing, and would propose to broaden those activities...." The primary purpose of the Center was to perpetuate Martha Graham's dance legacy by training dancers in her technique and by creating, rehearsing, and performing new works of art. Available audit reports reveal that the routinely combined accounts of the School and the Center regularly recorded salaries paid by the defendants to Martha Graham.

In 1956, Graham entered into a ten-year employment agreement with the School for the position of Program Director. Her title of employment later changed to Artistic Director. The 1958 tax protest, which focused on the educational purposes of the School, emphasized Graham's educational responsibilities and stated that Graham agreed to devote approximately one-third of her professional time to the School. But a preponderance of the credible evidence shows that Graham later became a full-time employee of the defendants and that one of her principal responsibilities as Artistic Director of the School and Center was to create new dances. The Center's Annual Report and payroll records show that Graham was a full-time employee. In

addition, Cynthia Parker–Kaback testified credibly on cross-examination that Graham was a full-time employee.

A preponderance of the credible evidence shows that Graham's employment agreement was renewed by defendants. As evidenced by W–2s and earnings statements in her name, as well as Center payroll records, Graham remained a salaried employee of the Center until the time of her death in 1991. Throughout this period, she also received employee benefits from the Center. Her personal and medical expenses were paid for by the Center, and the Center regularly withheld income tax and paid social security tax on her behalf.

The tools for Graham's choreographic works were also provided by the defendants. The creation of the dances was a collaborative process in which the Center's employees played an indispensable role. Janet Eilber, a principal dancer at the Dance Company, testified credibly that Graham "choreographed on" dancers employed by the Center. Linda Hodes testified credibly that while she was a dancer with the Dance Company, her salary was paid by the Center. The dancers were accompanied by pianists paid for by the Center, in rehearsal space, sets, and costumes paid for and provided by the Center.

Graham depended on the Center's board of directors to keep her and the dancers employed. For example, in 1990, she "implored the Board to help bring her dancers back," saying she was helpless until the "Company return[ed] from lay-off." Concerned with the "foster[ing] of the creative impulse and its needs," Graham recognized that "[she] could never have done what [she did] if [she] had not had such a place."

Protas argues that Graham cannot be considered to have been an employee be-cause she received royalties from the defendants for her ballets. The Second Circuit has held that "where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Playboy,* 53 F.3d at 555.

A preponderance of the credible evidence shows that Graham was not paid any royalties by the defendants. She was paid a salary for her choreography and her other job responsibilities without itemization. Plaintiff relies on a memorandum prepared by Michele Etienne and addressed to Protas, stating that "[i]n accordance with the Board of Trustees resolution of 1987 Ms. Graham is being paid a royalty of $40,000 per annum for the use of her ballets, her costumes and her Noguchi sets." This strange document was prepared by Etienne in 1989, two years after the date of the alleged resolution. The minutes of a March 27, 1987 board meeting state that:

> Ron Protas made a motion that the annual pension given to Georgia Sergeant [sic], Martha Graham's sister, and for many years the Registrar of the School, be formally voted at the request of MG. It was noted that said pension of $40,000 a year if approved would be in lieu of any payment of royalties and fees for the Companys [sic] use of Martha Grahams [sic] Ballets, Costumes and Noguchi sets, all of which remain her personal property. Roger Anderson seconded this motion and the full Board unanimously approved the motion which was then carried.

The motion described in this document was proposed by Protas and pertains to Georgia Sargeant's pension and not to the payment of royalties. As for the recitation "all of which remain her personal property," it is difficult to understand why such a recitation was necessary in 1987 if it was

an accurate reflection of established facts, other than to note that Protas edited the minutes before they were circulated.

Plaintiff also relies on the board minutes for June 21, 1990 which state that "Ron Protas asked the royalties of $40,000 that Martha Graham now receives for the use of the Noguchis, ballets, etc. from the Center be increased to $100,000." Protas' statement to the board is outweighed by credible evidence that such royalties were never paid. Francis Mason testified credibly that Graham did not receive royalties. As noted above, Michele Etienne testified credibly on cross-examination at the first trial that during her employment with the defendants, no royalty payments were made to Graham. Edmund Pease testified credibly that the historical records of the defendants showed that royalties were paid to the Center. Finally, based on his exhaustive study of the defendants' financial records, Marvin Preston testified credibly that the "royalties and commissions" that appeared as "functional expenses" in the auditors' reports prepared for the defendants were music royalties and payments to agents for tours and performances, respectively.

### At the Instance of the Employer

It is undisputed that Martha Graham was ultimately responsible for making all final artistic decisions relating to the dances. Nevertheless, a preponderance of the credible evidence shows that she created the dances as an employee at the instance of the defendants. Graham reported to the board regularly regarding her new works and dance-related activities and in recognition of her superior artistic talent, the board would try to assist her in her choreographic endeavors. That the Center's board of directors did not interfere with Graham's artistic decisions does not show that it did not have the legal authority, as her employer, to ensure that

dances were created at the "instance" of the defendants. The board set Graham's salary, obtained funding for the creation and performance of her dances, set spending limits for her activities, and licensed the dances on behalf of the Center. Graham's requests for additional rehearsal time and additional dancers were directed to the board. Judith Schlosser testified credibly that Graham asked the board for rehearsal time and money for sets and costumes for her new works and that sometimes the board had to limit certain aspects of Graham's activities because of a shortage of funds.

In 1969, a small group of the Center's board of directors listed in writing "the very worthwhile projects for the Company and the School." This list included new works, revivals, films of the dances and of the technique, classes, and performances. Jeannette Roosevelt, who was then President of the Center, testified credibly that these suggestions were forwarded in writing to Graham. During Graham's employment, the board also made suggestions of an artistic nature to her. For example, Christine Dakin, a dancer with the Dance Company, testified credibly that in the late 1980s, a few board members suggested that Graham create a work with Scandinavian themes and recommended a composer that she might consider for the work. Graham incorporated these suggestions into her choreography for Acts of Light and Tangled Night. Defendants have shown by a preponderance of the credible evidence that the 19 dances created by Graham before January 1, 1978 while she was their employee were works made for hire.

### Works Made for Hire under the 1976 Act

■ 17 U.S.C. § 201(b) provides that "[i]n the case of a work made for hire, the employer or other person for whom the

work was prepared is considered the author for purposes of this title, and unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 101 provides:

A "work made for hire" is: (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

The works at issue were clearly not "specially ordered or commissioned" for any of the nine specifically enumerated categories above. Nor do the defendants so argue. The question is whether the works were "prepared by an employee within the scope of ... her employment."

The 1976 Act does not define the term "employee." Noting this fact, the Supreme Court held that "the term 'employee' should be understood in light of the general common law of agency." *Reid,* 490 U.S. at 741, 109 S.Ct. 2166. In *Reid,* the Court specifically held that "employee" should not be interpreted exclusively in terms of whether the hiring party retains the right to control the product, nor in terms of whether the hiring party has actually wielded control over the création of the work. *Id.* at 742–43, 109 S.Ct. 2166. The Court then set out a balancing test for determining whether an employment relationship exists. The factors to be considered are: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill

required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. *Id.* at 751–52, 109 S.Ct. 2166. The Court specifically noted that "[n]o one of these factors is determinative," and that "the extent of control the hiring party exercises over the details of the product is not dispositive." *Id.* at 752, 109 S.Ct. 2166.

In *Aymes v. Bonelli,* 980 F.2d 857 (2d Cir.1992), the Second Circuit held that the "[*Reid* ] factors should not merely be tallied but should be weighed according to their significance in the case," and that the "*Reid* test was not intended to be applied in a mechanistic fashion." *Id.* at 861–62. It also identified five factors that "will be significant in virtually every situation ... and should be given more weight in the analysis." *Id.* at 861. The five factors are: (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party. *Id.*

An application of these five factors shows that Graham was an employee of the defendants. First, with respect to the hiring party's right to control the manner and means of creation, and the right to assign additional projects, *Reid* and *Aymes* teach that the extent of actual con-

trol the Board may have wielded over Graham's creations is not dispositive, and, moreover, should be distinguished from the Center's "right to control the product." That the Center's board of directors saw no reason to exercise its right to control the creation of the dances does not mean that it did not possess such a right. The board did exercise its control in all the ways it saw fit while giving deference to Graham's talent as a choreographer. As noted above, Graham reported regularly to the board on her new works, and the board set the financial bounds within which she could work, encouraged her to produce new work, and occasionally suggested themes for new dances. Second, during the entire term of her employment, defendants paid Graham a salary from which it routinely withheld income and social security taxes. Third, defendants paid Graham employee benefits and also paid for her personal, travel, and medical expenses.

Finally, Graham's high level of skill in choreography does not transform her 35 years as a regular employee of defendants into the project-oriented status of an independent contractor. *Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77 (2d Cir.1995), is particularly analogous to this case. In *Carter,* the Second Circuit held that a sculpture created by artists who "had complete artistic freedom with respect to every aspect of the sculpture's creation," was a work made for hire. *Id.* at 86. The court also found that the following factors pointed to an employment relationship: (1) provision of employee benefits and tax treatment of the plaintiffs; (2) that the artists were provided with many of the supplies to create the sculpture; (3) that they were employed for a substantial period of time, with no set date for termination; and (4) that the artists could not hire paid assistants without the owner's approval. The first three factors found significant by the court are also present in this case. That Graham chose the persons who were paid by defendants to assist her during her employment reflects her status as senior employee of the Center and does not render her an independent contractor.

The following additional factors, which are among the factors cited by *Reid* in determining the status of a hired party, point overwhelmingly to the conclusion that Graham was an employee of the defendants: (1) the Center, which paid for the dancers, pianists, sets, and costumes and which provided the rehearsal space, was the "source of [Graham's] instrumentalities and tools," *Reid,* 490 U.S. at 751, 109 S.Ct. 2166, for creating the dances; (2) Graham created the dances on the defendants' premises; (3) she was employed by the defendants for more than three decades; (4) the board of directors set a fixed annual salary for Graham with no separate compensation for the creation of dances; and (5) the creation of dances by Martha Graham was part of the "regular business" of the defendants.

Defendants have shown by a preponderance of the credible evidence that all of the 34 dances created by Martha Graham while she was employed by them between 1956 and her death in 1991 were works made for hire. Protas has not offered any evidence of an agreement between the Center and Graham to the contrary. Accordingly, copyright in the post–1956 works does not belong to Protas. The presumption of copyright validity attached to Protas' non-competing certificates of copyright registration for three unpublished dances created by Graham after 1956, The Owl and the Pussycat, Judith (created in 1980), and Phaedra's Dream, has been rebutted by the evidence that these dances were works made for hire. *See Carol Barnhart, Inc. v. Econ. Cover Corp.,* 773 F.2d 411, 414 (2d Cir.1985) ("[A] certificate of registration creates no irre-

buttable presumption of copyright validity. Extending a presumption of validity to a certificate merely orders the burdens of proof.") (citations omitted); *Durham Indus. Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980) ("Where other evidence in the record casts doubt on the question, validity will not be assumed.").

### Published Post–1956 Works

As discussed above, ten of the post–1956 dances have been published. Those ten dances and their years of first publication are: Clytemnestra (1979), Acrobats of God (1969), Circe (published before 1993), Cortege of Eagles (1969), Adorations (1976), Acts of Light (1984), The Rite of Spring (published before 1993), Temptations of the Moon (published before 1993), Night Chant (published before 1993), and Maple Leaf Rag (1991). Maple Leaf Rag was published after the permissive notice requirements of the Berne Convention Implementation Act took effect. Defendants have shown by a preponderance of the credible evidence that Acrobats of God and Cortege of Eagles are works made for hire and that both of these dances were published in the film "3 by Martha Graham" with adequate notice of the Center's copyright.

Despite the fact that he applied to register copyright in all of the dances as unpublished works, Protas now concedes that Acrobats of God and Cortege of Eagles were published in "3 by Martha Graham" with notice of the Center's copyright. Seeking to take advantage of defendants' affixation of the required notice to secure their copyright, however, he argues that the copyright notice on that film incorrectly named the Center as the copyright proprietor instead of Graham, and that the notice in the Center's name secured to Graham copyright in the dances published in the film.

Protas' reliance on *Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir.1970) is misplaced. In *Goodis*, plaintiff, the author of a novel, made arrangements in 1945 for his book to be printed in April 1946. After he had made the printing arrangements, on December 20, 1945, he sold the exclusive motion picture rights in the novel to Warner Brothers. Before the book was published, plaintiff received payment from a publishing company for the right to serialize the novel in a magazine. The book publisher agreed to postpone distribution of the book until October 1946, so that the novel was first published in eight installments in the magazine. Each issue of the magazine contained a single copyright notice in the magazine's name, but no notice in the author's name. Warner Brothers produced and exhibited the motion picture based on the novel and assigned its contract rights to defendant United Artists. After United Artists broadcasted a television film version of the motion picture, the author of the novel brought suit for copyright infringement. Defendant argued that the work had fallen into the public domain because the magazine publisher, "a mere licensee," had registered copyright in its name alone. The Second Circuit held that where "a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." *Id.* at 399. The court acknowledged that the magazine publisher "did not own all the rights" in the novel at the time that it was first published, but refrained from applying the doctrine of " 'indivisibility of copyright' which rejects partial assignments of copyrights and requires a proprietor or assignee of a copyright to hold nothing less than all the rights in a copyrighted work."

*Id.* at 400. It was reluctant to "thrust" the novel into the public domain "when, as here, everyone interested in [the novel] could see [the magazine publisher's] copyright notice and could not have believed there was any intention by [the author] to surrender the fruits of his labor." *Id.*

Acrobats of God and Cortege of Eagles were created by Graham but were "authored" by the defendants because these works were works made for hire. 17 U.S.C. § 26 (1976 ed.) ("In the interpretation and construction of this title ... the word 'author' shall include an employer in the case of works made for hire."). As Graham's employers the defendants owned *all* the rights in Acrobats of God and Cortege of Eagles when these works were published in "3 by Martha Graham," and correctly placed a notice of copyright in its own name on the film. In doing so, defendants preserved copyright in works that rightfully belonged to them. Accordingly, there is no danger of these works falling into the public domain.

With respect to seven post–1956 published dances, Clytemnestra, Circe, Adorations, Acts of Light, The Rite of Spring, Temptations of the Moon, and Night Chant, neither side has shown whether any of these dances were published with the required statutory notice of copyright.

### V. Works Created by Graham prior to 1956

Of the 70 dances at issue, Graham created 36 prior to the time that she commenced her employment with the defendants in 1956. These 36 works are: Tanagra, Three Gopi Maidens, Flute of Krishna, Heretic, Lamentation, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Celebration, Dream, Saraband, Frontier, Panorama, Imperial Gesture, Chronicle/Steps in the Street, Deep Song, American Document, Every Soul is a Circus, El Penitente, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Herodiade, Appalachian Spring, Dark Meadow, Cave of the Heart, Errand into the Maze, Night Journey, Diversion of Angels, Eye of Anguish, Judith, Canticle for Innocent Comedians, Ardent Song, and Seraphic Dialogue.

Of the 36 pre–1956 dances, 16 have been published. These 16 dances and their years of first publication are: Flute of Krishna (1923), Heretic (1930), Lamentation (1930), Celebration (1934), Frontier (1935), Panorama (1935), Chronicle/Steps in the Street (1936), American Document (1938), El Penitente (1991), Herodiade (1991), Appalachian Spring (1959), Cave of the Heart (1976), Errand into the Maze (1984), Night Journey (1960), Diversion of Angels (1976), and Seraphic Dialogue (1969).

### Public Domain

Copyrights secured before January 1, 1964 are governed by the stringent renewal requirements of the 1909 Act. Copyrights secured after January 1, 1964 are governed by the 1976 Act as amended by the Copyright Renewal Act of 1992. *See* 17 U.S.C. § 24 (1976 ed.); 17 U.S.C. § 304; The Copyright Renewal Act of 1992, Pub.L. No. 102–307, 106 Stat. 264, § 101 (June 26, 1992). Under the renewal provisions of the 1909 Act, the copyright term of published works ended 28 years after the date of first publication with adequate notice unless copyright was renewed in the final year of copyright protection. The 1909 Act provided:

> The copyright secured by this title shall endure for twenty-eight years from the date of first publication .... [The author or her successors] shall be entitled to a renewal and extension of the copyright in such works for a further term of twenty-eight years when application for

such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

17 U.S.C. § 24 (1976 ed.); *See also Shoptalk*, 168 F.3d at 590 ("If the initial copyright term expired without renewal, the work entered the public domain.").

Of the 16 published dances created prior to 1956, ten were first published before January 1, 1964: Flute of Krishna, Heretic, Lamentation, Celebration, Frontier, Panorama, Chronicle/Steps in the Street, American Document, Appalachian Spring, and Night Journey.[10] Those ten works are governed by the stringent renewal requirements of the 1909 Act. Since the Copyright Office has no record of any registration prior to 2000, the evidence is clear that any copyrights secured in those ten published works were not timely renewed. Accordingly, those ten works are in the public domain, even if they had been first published with adequate notice of copyright.

### Commissioned Works

■ A preponderance of the credible evidence shows that prior to 1956, Martha Graham was commissioned to create seven dances by a number of renowned musical and cultural organizations and that these dances were first performed between 1944 and 1953. The seven dances are: Herodiade, Appalachian Spring, Dark Meadow, Cave of the Heart, Night Journey, Judith (created in 1950), and Canticle for Innocent Comedians.

Of the seven commissioned dances, four, Appalachian Spring, Night Journey, Herodiade, and Cave of the Heart, have been published. Plaintiff's certificates of copyright registration for these four dances as unpublished works do not constitute prima facie evidence of copyright validity. Neither side has obtained certificates of copyright registration for the remaining three works, Dark Meadow, Judith (created in 1950), and Canticle for Innocent Comedians, which are unpublished.

Since all of the commissioned dances were created prior to January 1, 1978, they are governed by the 1909 Act. Unlike the 1976 Act, the 1909 Act did not preempt common law protection, but permitted common law copyright to subsist in a work until first publication. Statutory protection attached upon first publication with notice. *See* 17 U.S.C. § 2 (1976 ed.) ("Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law ... to prevent the copying, publication or use of such unpublished work without his consent, and to obtain damages therefor."); 17 U.S.C. § 10 (1976 ed.) ("Any person entitled thereto ... may secure copyright for his work by publication thereof with the notice of copyright ....").

The commissioning party is the presumptive owner of copyright in the works it commissions under both the 1909 Act and the common law of New York. "[C]ourts generally presumed that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." *Reid*, 490 U.S. at 744, 109 S.Ct. 2166 (citing *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 31 (1939); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d

---

**10.** Two of the works that are in the public domain, Appalachian Spring and Night Journey, were commissioned by third parties. *See infra.*

Cir.1955), *reh'g granted and rev'd in part on other grounds,* 223 F.2d 252 (2d Cir. 1955)).

In *Yardley,* the Second Circuit noted that:

> ·If [an artist] is solicited by a patron to execute a commission for pay, the presumption should be indulged that the patron desires to control the publication of copies and that the artist consents that he may, unless by the terms of the contract, express or implicit, the artist has reserved the copyright to himself. Such a presumption must rest on the supposed intention of the parties .... [T]he right to copyright should be held to have passed with [the work created by the artist], unless the plaintiff can prove that the parties intended it to be reserved to the artist.

*Yardley,* 108 F.2d at 31. *See also Brattleboro,* 369 F.2d at 568 (" 'Whether the copyright resides in the person thus commissioning the work or in the independent contractor creating the work will always turn on the intention of the parties where that intent can be ascertained.' Where that intent cannot be determined the presumption of copyright ownership runs in favor of the employer.") (citations omitted); *Dielman v. White,* 102 F. 892, 894 (C.C.D.Mass.1900) ("[W]hen an artist is commissioned to execute a work of art not in existence at the time the commission is given, the burden of proving that he retains a copyright ... rests heavily upon the artist himself ... [and there is] a very strong implication that the work ... is to belong unreservedly and without limitation to the patron.").

With respect to all of the commissioned works, no party has proved that Graham and the commissioning parties intended the copyright to be reserved to Graham. As discussed above, two of the published commissioned works, Appalachian Spring and Night Journey, are in the public domain. There are two published commissioned works, Herodiade and Cave of the Heart, for which neither side has offered any evidence regarding whether they were published with adequate notice. Three commissioned works, Dark Meadow, Judith (created in 1950), and Canticle for Innocent Comedians, remain unpublished.

### Assignment of Copyright in the Pre–1956 Works

 There is no writing in evidence in which Graham assigned copyright in the dances to the Center. Nonetheless, "[i]t is well settled ... that the transfer of the 'common law copyright' in unpublished works did not have to be in writing but could be oral or inferred from conduct." *Jerry Vogel Music Co. v. Warner Bros., Inc.,* 535 F.Supp. 172, 174 (S.D.N.Y.1982) (inferring a transfer of common law copyright prior to a song's publication and copyright registration by the alleged assignee from evidence of a "sequence of events" that "bespeak of an ongoing relationship" between assignor and assignee that began before the date of first publication). *See also Gladys Music, Inc. v. Arch Music Co., Inc.,* 150 U.S.P.Q. 26, 30 (S.D.N.Y.1966).

In *Estate of Ernest Hemingway v. Random House, Inc.,* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968), plaintiffs sued the publisher and author of a book containing lengthy quotations from Hemingway's conversations with the author. Plaintiffs alleged that the book contained literary matter composed by Hemingway in which he had a common law copyright and that its publication constituted an unauthorized appropriation of his work. The New York Court of Appeals noted that during Hemingway's lifetime, it had been a "continuing practice" for the book's author to write articles about Hemingway consisting largely of quotations

from his conversations, and that Hemingway approved of all of this. It held that "[i]n these circumstances, authority to publish must be implied, thus negativing the reservation of any common-law copyright." *Id.* at 349, 296 N.Y.S.2d 771, 244 N.E.2d 250. Similarly, in *Houghton Mifflin Co. v. Stackpole Sons*, 104 F.2d 306 (2d Cir.1939), *cert. denied*, 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939), the Second Circuit held that since Adolf Hitler "did not himself take out the copyright" in the book he had authored, "there was no need of a formal assignment by him" to the publishers of the book. *Id.* The court held that "mere delivery of the manuscript was sufficient" to show that the copyright in the manuscript had been assigned to the publishers. *Id.*

In January of 1957, Graham gave all her theatrical properties to the defendants, but the document conveying these properties did not mention the copyright in the choreographic works. A preponderance of the credible evidence shows that between January of 1957, but prior to 1965 or 1966, Graham assigned to the defendants copyright in 21 non-commissioned, pre–1956 works that were unpublished at that time. Those works are: Tanagra, Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul is a Circus, El Penitente (first published 1991), Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Errand into the Maze (first published 1984), Diversion of Angels (first published 1976), Eye of Anguish, Ardent Song, and Seraphic Dialogue (published 1969).

In February of 1971, LeRoy Leatherman, the Executive Administrator of the Center, wrote to Linda Hodes, previously a principal dancer with the Dance Company. In denying Hodes' request to perform the Graham dances while she was at the Netherlands Dance Theater, Leatherman stated that:

Martha has asked me to answer a part of your letter to her, dated January 30th....

About the Netherlands Theatre and the works: Martha has assigned all rights to all of her works to the Martha Graham Center, Inc. She did this for two reasons: To be sure that some responsible control would be exercised over them in the future and so that someone other than she would take the responsibility now for saying yes or no to the requests that are coming in from all directions. The Board of Directors is now faced with formulating a firm policy about the works and what is to happen to them.

Linda Hodes, who was closely associated with Graham and the defendants since the early 1950s, testified credibly that she received such a letter written on Center letterhead and signed by Leatherman. She first met Graham in 1940 and continued to interact with Graham until her death. Hodes had "daily conversations" with Graham. In her last will, Graham requested that Protas consult with her friends, among whom she listed Linda Hodes first.

Previously, in September of 1968, Leatherman had written a letter denying a request by Benjamin Harkarvy, Director of the Netherlands School, to perform the dances. In that letter, Leatherman stated that:

Recently Miss Graham assigned performing rights to all of her works to the Martha Graham Center of Contemporary Dance, Inc.... and the decision to grant such rights rests now exclusively with the Center's Board of Directors. The members of the Board, in planning for the future of the Martha Graham

Dance Company, are now discussing what policy will be adopted in regard to performing rights to other Companies. . . .

Miss Graham deeply regretted that she was unable to attend your recent New York season and asks me to send you her congratulations and her greetings.

LeRoy Leatherman had been the principal managerial employee of the defendants and a member of the board of directors of the School dating back at least to 1956, when the School was incorporated. In January of 1958, as Secretary and Treasurer of the School, he signed the tax protest submitted by the School to the Internal Revenue Service and stated that the information contained in the protest was true to his knowledge, information and belief. Jeanette Roosevelt, who served as a member of the Center's board of directors from 1965 or 1966 until the end of 1972, and as President of the Center and of the School from 1968, testified that Leatherman was very loyal to Graham and was concerned that her wishes be met. She recalled that Hakarvy's request to perform the dances had been denied. By using Roosevelt's deposition in questioning her at trial, plaintiff established that it was Roosevelt's understanding that Graham had given the choreographic works to the Center prior to the time that Roosevelt became a board member. Roosevelt knew about this transfer because it was "part of the board's understanding" and because the board "had records in which [Graham] had given the materials to the board." Roosevelt further testified at the trial that "it was [the board's] assumption that whenever dances were created they would become works that the board was responsible for. It was a continuation of the situation that had come about when [Graham] gave the works to the board."

Roosevelt was a credible and forthcoming witness.

Documentary evidence and the credible testimony of several witnesses show that throughout the 1960s, 1970s, and 1980s, the defendants consistently acted as the owners of the ballets created by Graham prior to 1956, and that Graham did not object to such actions by the defendants. In addition to the representations made to third parties by Leatherman, the Center entered into contracts with third parties pertaining to performances by the Dance Company as well as the filming and publication of the pre–1956 works. Jeannette Roosevelt testified credibly that in 1960 or 1961, while she was director of the American Dance Festival, Leatherman, on behalf of the Center, signed a contract with the Festival in connection with the performance by the Dance Company at the Festival. Lee Traub testified credibly that while she was a member of the board between 1974 and 1994, the Center contracted with third parties for performances by the Dance Company, and for the making of dance films. In her final will, Graham requested Protas to consult with her "friend," Lee Traub.

In 1969, Seraphic Dialogue, a pre–1956 dance, was published in the film "3 by Martha Graham." That film was produced by the Center during Graham's employment with her obvious consent, and published in 1969 with notice of copyright in the Center's name. Graham herself danced in the film. William McHenry, a member of the Center's board of directors, testified credibly that in 1968 or 1969, on behalf of the Center, he negotiated for the licensing of "3 by Martha Graham" to National Educational Television ("N.E.T."). In a 1969 letter addressed to N.E.T. and copied to Leatherman, McHenry stated that "[i]n the United States we reserve film rights for all uses; outside the United

States we are to have all rights." Also in 1969, during license negotiations pertaining to "3 by Martha Graham" with Harold Shaw, a presenter of dance performances, McHenry affirmed that "foreign rights for the tapes/film will be held by the Martha Graham Center of Contemporary Dance, Inc." Minutes from the Center's board of directors meeting on February 20, 1970, state that "[i]t was noted that 'Three by Martha Graham' had been presented on N.E.T. on October 21st and at this time is being transferred to 16 MM film for distribution to Schools, Colleges and Universities." Martha Graham is listed in the minutes as among those present at that meeting. On August 10, 1970, LeRoy Leatherman, on behalf of the Center, executed a license agreement with "Adams Production," granting the latter "in perpetuity the sole, exclusive right under copyright and otherwise, to exhibit, rent, license, lease, distribute, sub-license, sub-lease, sub-distribute and/or sell ... prints of [3 by Martha Graham] throughout the world."

In 1973, Protas wrote a letter to Arnold Weissberger stating that:

I am making arrangements to have a work film made of "Clytemnestra" and "Secular Games", "Myth of a Voyage" and "Mendicants of the Evening". I would be grateful if we could draw up a contract between the Center and the photographer, Mr. Nathaniel Tripp, stating that we retain all rights to these films and that he has no authority to make duplicates of them.

Minutes of the Center's board of directors' meeting for September 11, 1984 describe an agreement between the Center and Danish Radio regarding films of Acts of Light, Cave of the Heart, and Errand into the Maze that "was much better for the Center in the long run because the Center would own the film and could sell both the broadcast and the video rights." The minutes also note that "[t]he Center had already entered negotiations with PBS for broadcast of the Danish film program," and that the Center had refused PBS' request for 50% of cable TV sales and 10% of video sales.

Minutes of the Center's board of directors' meeting for October 18, 1984, at which Martha Graham was present, state that:

Ron Protas ... detailed to the Board the extraordinary filming deal Jim Nomikos had made in Denmark. The Center now owns the 90 minute film of the three ballets—'Cave of the Heart', 'Errand into the Maze', and 'Acts of Light'—which it will sell to PBS for $100,000 and possibly to various European countries.... Ron thanked the Board saying that without their support the deal could never have been made.

The December 11, 1984 board minutes state that $100,000 had been received "from the PBS film," and that "because the Center now owned the film and all the rights, it could now sell the broadcast rights and also, possibly, videocassettes around the world. The film could, therefore, generate several hundred thousand dollars income for the Center."

In September of 1990, the Center entered into an agreement with NHK, a Japanese television network, for two taped dance performances. Protas, as General Director, represented the Center in that license agreement. The agreement stated that the Center retained "all broadcast rights outside of Japan" and "the rights to perform" the two dance programs.

Protas admitted on cross-examination that in 1985, while he was the Center's "General Director," the Center entered into a "presentation agreement" with the 55th Street Dance Theater Foundation,

Inc. for the "production" of dance performances. Although Protas testified that the Center obtained Graham's permission to enter into this agreement, there is no evidence that such permission was necessary or that it was obtained. Furthermore, Judith Schlosser and Jeannette Roosevelt testified credibly that the Dance Company did not have to request permission from Graham to perform the dances.

Finally, Pease's 1974 study of the defendants' historical records revealed that the Center received royalties and paid all of the expenses related to the creation of the dances. He testified credibly that the "background ledgers" he studied showed that prior to 1974, the dances, sets, and costumes had been listed as assets on the defendants' financial statements.

Plaintiff argues that Leatherman's representations to third parties are not reliable in light of a 1972 letter from Louis Goodkind, a member of the Center's board of directors, to Graham stating that other than two works that Graham had assigned to the Center, "as far as I know, you retain title to the other choreographic works which you created, and I suppose that the sets and properties relating to the various productions belong to whoever commissioned them." As Executive Administrator, Leatherman was intimately involved in the day-to-day operations of the defendants. Accordingly, he was much better placed than Goodkind to know of an assignment of all the rights in the dances.

Plaintiff also attempts to undermine Leatherman's credibility by introducing a letter Leatherman wrote to Linda Hodes in October of 1971 in which he asked Hodes to keep certain plans of dance tours from Graham. That letter was written at least five or six years after the assignment of the works. Furthermore, that letter does not show that Leatherman kept Graham uninformed of his letter to Hodes in which he described the assignment. On the contrary, in his February 1971 letter to Hodes describing the assignment and denying her request to perform the dances, Leatherman specifically mentioned that Graham had asked him to respond to Hodes' request.

Next, plaintiff argues that Graham's 1960 tax return shows that she received royalties from Nathan Kroll for the dance Night Journey. Neither side presented evidence as to what these royalties represented. In any event, as discussed above, Night Journey and Appalachian Spring, for which Graham received royalties from Phoenix Films, were published in 1960 and 1959 respectively, and are in the public domain.

Plaintiff also relies on Cynthia Parker–Kaback's testimony that in the mid–1970s, she prepared and mailed to the Copyright Office applications for registration of copyright on behalf of Graham. From observing Parker–Kaback's demeanor and listening to her testimony, I do not credit her statement that she submitted the applications for registration to the Copyright Office. It is undisputed that the Copyright Office has no record of copyright registrations made prior to Graham's death for the dances at issue. Although she was in theory an employee of the defendants, Parker–Kaback was hired by Protas, unquestioningly followed his orders, and remained closely associated with him.

Although Parker–Kaback testified that in 1974 she "report[ed] to the board that the application [for copyright in Graham's name] was going through" and that the issue was "discussed at board meetings," I do not credit her testimony. Pease, a more independent witness who undertook an exhaustive study of ownership of the ballets, sets, and costumes, testified credibly that it was his best recollection that such a discussion did not take place. Fur-

thermore, copies of eleven copyright applications prepared by Parker–Kaback show that nine of the applications were incomplete, i.e., they did not include the page containing the claimant's signature.

Plaintiff also relies on the notice of copyright in Graham's name that appeared in the 1978 and 1982 programs for performances by the Dance Company. Those notices were placed at the direction of Parker–Kaback and not Graham. Parker–Kaback testified that she had told Harold Klein, an attorney who specialized in copyright matters, "to go to Barbara Ringer, the director of copyrights in Washington," "[t]o ask her if there was any way we could copyright, Martha Graham could copyright her works." She also testified that based on what Klein told her, she "passed on the information that this wording was to appear in all programs from now on." She further testified that she did not have any conversations with Graham about copyrighting her works, but that she spoke with Alex Racolin, Graham's attorney. Finally, Parker–Kaback's 1974 memorandum to Protas and board members Arnold Weissberger and Francis Mason, stating that "I am assuming that there is no question in any of our minds that Martha personally owns the rights to all of the works," is not probative on the issue of assignment. Francis Mason testified credibly that he did not respond to that memorandum because it was not his habit to do so.

Plaintiff points to a June 21, 1985 letter from Diane Gray, the director of the School, regarding the use of Steps in the Street by one Barry Fisher for a doctoral project. In this letter, Gray stated that "Miss Graham has never given him permission to use her work." As discussed above, common law copyright in Steps in the Street/Chronicle was extinguished when it was first published in 1936, and

this work is in the public domain. Plaintiff also points to Graham's earlier will drawn in 1987 in which she bequeathed for the benefit of her sister, Georgia Sargeant, "all royalties payable with respect to the ballet 'Diversion of Angels' to my Trustees, IN TRUST." As discussed above, James McGarry testified credibly at the first trial that he drew Graham's will in "no more than an hour" without conducting any investigation regarding what she owned. Plaintiff also relies on a letter Graham wrote on May 16, 1990 in which she stated that "[t]o support the Company, I have agreed to allow some of the ballets to be licensed." Graham's statements in the final years of her life, when she was in her nineties, do not negate the assignment of her pre–1956 dances, which had occurred more than two decades before. Moreover, contrary to the letter of May 16, 1990, many films of the ballets had already been licensed and published extensively by the Center in the 1960s and the 1970s.

The evidence of Graham's assignment of the works to the Center is sufficient to overcome the presumption of copyright validity of Protas' non-competing certificates of copyright registration for the following unpublished pre–1956 dances: Tanagra, Primitive Mysteries, Satyric Festival Song, Deep Song, Every Soul is a Circus, and Punch and the Judy. *See Carol Barnhart*, 773 F.2d at 414.

### Assignment of Renewal Term

As of January 1, 1978, common law copyright in unpublished works that were copyrightable under the 1976 Act was transformed into statutory copyright which subsisted from January 1, 1978 and endured for 70 years after the death of the author. 17 U.S.C. § 303 ("Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided

by section 302."); 17 U.S.C. § 302(a) ("Copyright in a work ... endures for a term consisting of the life of the author and 70 years after the author's death."). As discussed above, under the 1909 Act, common law copyright subsisted in unpublished works until first publication. 17 U.S.C. § 2 (1976 ed.) ("Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law ....").

Accordingly, with respect to works that were unpublished as of January 1, 1978, there is no renewal term. Of the 21 works assigned by Graham to the defendants, 17 remain unpublished, and two works were first published after January 1, 1978. The 17 assigned works that remain unpublished are: Tanagra, Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul is a Circus, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Eye of Anguish, and Ardent Song. The two assigned works that were first published after January 1, 1978 are El Penitente (published 1991) and Errand into the Maze (published 1984).

With respect to works that were published prior to January 1, 1978 with adequate notice of copyright, the original term of statutory copyright was secured upon first publication and endured thereafter for 28 years, after which the renewal term began. As discussed above, a preponderance of the credible evidence shows that the original term of copyright in Seraphic Dialogue, which was first published with notice of the Center's copyright in 1969, was assigned by Graham to the defendants.

■■■ Assignment of copyright in the renewal term, however, may not be implied from the conduct of the parties. It is well established that "there is a strong pre-

sumption against the conveyance of renewal rights." *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir.1993). "'[I]n the absence of language which expressly grants rights in "renewals of copyright" or "extensions of copyright" the courts are hesitant to conclude that a transfer of copyright ... is intended to include a transfer with respect to the renewal expectancy.'" *Id.* (citations omitted). *See also Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 653, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 747 (2d Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

■■■ In the absence of any evidence of an express grant of the right to renew the copyright in Seraphic Dialogue, "the author's executors, if such author, widow, widower, or children are not living, ... shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years." 17 U.S.C. § 304(a)(1)(C). Furthermore, the renewed copyright in such a work vests with the person entitled to the renewal of the copyright as of the last day of the original term of the copyright, even if no renewal application is made. 17 U.S.C. § 304(a)(2)(B) ("[I]f no such application is made or the claim pursuant to such application is not registered, [the copyright shall endure for a renewed term of 67 years which] shall vest, upon the beginning of such further term, in any person entitled under ... [17 U.S.C. § 304(a)] (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright."). Accordingly, Protas, as executor of Graham's estate, is entitled to the renewed copyright in Seraphic Dialogue even though there is no evidence that he has filed a renewal application with the Copyright Office for this work.

### Published Pre–1956 works

Sixteen of the pre–1956 works have been published. As discussed above, ten of these works are in the public domain because of the failure to renew copyright timely,[11] and two dances, Herodiade and Cave of the Heart, are commissioned works. The right to renew the copyright in Seraphic Dialogue has reverted to Protas. The remaining three works are El Penitente (published 1991), Errand into the Maze (published 1984), and Diversion of Angels (published 1976).

Defendants' copyright in El Penitente has been preserved because it was first published in 1991, after the permissive notice requirements of the Berne Convention Implementation Act took effect. With respect to the remaining two works, Errand into the Maze, and Diversion of Angels, there is no evidence that copyright in these works was secured upon first publication by the affixation of the required notice of copyright.

### VI. Sets and Costumes

Plaintiff seeks replevin and a declaration of ownership with respect to the following property: (1) Noguchi sets other than the six pieces (three Herodiade sculptures, Lyre, Cave of the Heart and Wood Sculpture of a Horse) sold to the J.M. Kaplan Fund; (2) a casting from Herodiade; (3) the Noguchi jewelry from Judith; (4) costumes designed and worn by Graham; (5) dance clothes manufactured by Danskin; and (6) Halston costumes given to Graham.

Defendants counterclaim for a declaration that they own the original sets and costumes for all of the dances at issue, and seek to replevin the Noguchi sets in Protas' possession. Defendants also counterclaim for replevin of the following items: (1) all costumes; (2) books and bibliographic materials; and (3) films and videotapes.

■ Under New York law, to establish a claim for replevin, the claimant must show ownership of the chattel and entitlement to its possession. When the original possession by the defendants is lawful, the claimant must also show a demand for the return of the chattel, and refusal of the demand. *See* 23 N.Y. Jur.2d § 45; *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 1994 WL 445618, at *5 (S.D.N.Y.1994) (citing *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317–18, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991)); *Feld v. Feld*, 279 A.D.2d 393, 720 N.Y.S.2d 35, 37 (1st Dep't.2001) ("A cause of action for replevin or conversion requires a demand for the property and refusal.").

Defendants argue that they do not need to establish a demand and refusal to prevail on their replevin claim because Protas did not have lawful possession of their property. No evidence was presented at trial regarding whether plaintiff demanded return of the property he now claims and whether this demand was refused by the defendants. The Amended Complaint alleged that such a demand had been made and refused, but the Amended Answer denied this allegation, asserting only that Protas had sought access to defendants' warehouse and that access had been denied. Plaintiff relies on an email written by Marvin Preston, Executive Director of the defendants, to establish that a demand and refusal occurred. In this email, Preston stated that "I've determined that we do have costumes and set for Maple Leaf Rag which are the property of Ron/the

---

**11.** As discussed above, two of the works in the public domain, Appalachian Spring and Night Journey, are commissioned works.

Trust. So, on Friday, we will provide them as well." That email does not establish that the properties claimed by plaintiff were demanded and refused.

## The Noguchi Sets

At trial, Protas testified that 19 sets were created by Noguchi for the following 20 dances: Frontier, Horizons, El Penitente, Imagined Wing, Herodiade (remaining 3 pieces), Appalachian Spring, Dark Meadow, Cave of the Heart, Errand into the Maze, Night Journey, Diversion of Angels, Judith (chair, five or six screens, jewelry), Voyage (1953)/Circe (1963) (same set), Seraphic Dialogue, Clytemnestra, Embattled Garden, Acrobats of God, Phaedra, and Cortege of Eagles. He also testified that defendants do not have one of the pieces from the Embattled Garden set which was loaned to the Isamu Noguchi Museum. On cross-examination, Protas testified that the sets for Horizons were not created by Calder, as stated in the "Martha Graham Repertoire," but were instead created by Noguchi. Other than Protas' testimony, no additional evidence was introduced by plaintiff to show which sets were created by Noguchi.

In claiming ownership of the Noguchi sets, plaintiff relies on a document labeled "Addendum to the Minutes of the Board of Trustees" for June 23, 1988, a separate page that was not incorporated into the board minutes for that day. The "Addendum" states that "[t]he Board unanimously confirmed that all of the sets of Isamu Noguchi were given to Martha Graham, and that if some were credited to the [C]enter's assets, that this was incorrect and would be changed. It was only asked that it be formally implemented through Peter Morrison." ' This puzzling document is both unclear and unreliable, particularly in light of the evidence at the first trial that all drafts of minutes had to be

approved by Protas before they were circulated.

Plaintiff also relies on the minutes of a March 27, 1987 board meeting which stated that "said pension of $40,000 a year [to Georgia Sargeant] if approved would be in lieu of any payment of royalties and fees for the Companys [sic] use of Martha Grahams [sic] Ballets, Costumes and Noguchi sets, all of which remain her personal property.... [T]he full Board unanimously approved the motion which was then carried." As discussed above, the motion at issue in this document was proposed by plaintiff and pertains to Georgia Sargeant's pension, and not to the payment of royalties. In any event, Protas has not established by a preponderance of the credible evidence that any royalties were paid to Graham by the defendants.

■ A preponderance of the credible evidence shows that on January 15, 1957, Graham transferred all her existing theatrical properties to the School. This transfer included the complete theatrical settings for sixteen separate ballets, most of which had been created by Noguchi, the entire costume wardrobe used with these sixteen works, and all her electrical and basic stage equipment. A document dated January 15, 1957 records "a legal transfer of ownership" to the School of all theatrical properties then owned by Graham. That this document was eventually signed and executed by Graham is shown by the specific reference in the tax protest that defendants filed in 1958. The tax protest states:

Miss Graham in the middle of January 1957, transferred to the School almost all of her theatrical properties. This donation included the complete theatrical settings for sixteen separate dance-dramas, most of which settings had been executed for her by the celebrated Japanese–American artist, Isamu Nogu-

chi.... In addition to the sets, Miss Graham included in her donation to the School the entire costume wardrobe used with these sixteen works, as well as all her electrical and basic stage equipment, including a Davis dimmer board, twenty-five sets of assorted black draperies and floor cloths, a large amount of electrical cable, two floodlights and twelve spotlights.

Accordingly, with the exception of the sculptures sold by the Center to the J.M. Kaplan Fund in 1990, all of the theatrical properties including the Noguchi sets and jewelry in Graham's possession as of January 15, 1957 are property of defendants.

In June of 1988, Peter Morrison, a member of the Center's board of directors, commenced an investigation into the ownership of Noguchi sets. When he fell ill, Kevin Rover, a member of the Center's board, took over the investigation in late 1988 or 1989. Rover testified credibly that he was not shown numerous documents pertaining to the ownership of the sets and costumes, including, in particular, documents pertaining to Graham's 1957 transfer of all theatrical properties to the School. Evidence admitted at the first trial shows that in connection with collateral for a loan obtained from Sotheby's, Protas attempted to persuade Rover that Graham owned the Noguchi sets.

Also admitted at the previous trial was a letter to Protas from Rick Burke, President of the Center and a member of the board of directors, addressed to Protas. That letter stated that:

> As far as the art is concerned, it concerned me that last year you attempted to move the art from the Center back to Martha and the Board delay [sic] a decision until we had legal advice which we never acted on. I did talk to Peter who stated flately [sic] that all the art was owned by the Center to protect them from inheretance [sic] taxes and give the Center the necessary assets to finance the company. Your action without talking to me, concerned me and other members of the Board. No one disputes you run the show and deserve what ever Martha wants to give you.

Board minutes for July 1989 state that Rover proposed a motion "establish[ing] Martha Graham as the owner of the Noguchi sets and jewelry" and that the motion was adopted by the board. The language of the July 1989 resolution and Burke's letter show that the board was led to believe at that time that Graham owned the Noguchi sets. The resolution does not purport to reassign to Graham sets that she had previously transferred to the Center. Indeed, there is no evidence of donative intent, i.e., that the members of the board intended their resolution to effect a transfer of ownership from the Center to Graham.

The sets for the following 12 dances created prior to 1957 were created by Noguchi: Chronicle/Steps in the Street, Imagined Wing, Herodiade, Appalachian Spring, Dark Meadow, Cave of the Heart, Errand into the Maze, Night Journey, Diversion of Angels, Judith (created in 1950), Voyage, and Seraphic Dialogue. This list is obtained from the Repertoire of Graham's dances.[12] Any possession of the pre–1957 sets by Protas is unlawful, and accordingly, defendants do not have to show that a demand and refusal occurred with respect to those items. Defendants, however, have not shown that any of these

---

**12.** Both parties agreed to be bound by the Repertoire for a chronological list of the dances created by Graham. Defendants rely on the Repertoire for identifying which dances had sets designed by Noguchi. In his testimony, Protas did not accept the accuracy of the set designers named for each dance in the Repertoire.

sets are currently in Protas' possession. Neither side has shown how the Noguchi sets and jewelry which were used in the Graham ballets created after January 15, 1957 were acquired.

### Remaining Sets, Costumes, and Theatrical Properties

As discussed above, Graham transferred all of her then existing theatrical properties, costumes, and stage equipment to the defendants in January of 1957. Accordingly, defendants own all of that property. In addition, a preponderance of the credible evidence shows that after January of 1957, the Center regularly paid for the making and repair of all theatrical properties, stage equipment, and costumes, and that costumes were routinely donated to the defendants. In 1974, Edmund Pease found in his "thorough study" of documents dating back to the Center's early years that the Center had borne the expenses of creating the sets and costumes. In 2000, Marvin Preston concluded from a detailed study of the defendants' records that the sets and costumes were paid for by the defendants and that these items were assets of the defendants. Preston was a forthcoming and credible witness. Lee Traub, a member of the Center's board of directors, and its Chairman for many years, testified credibly that various designers, including Halston, donated costumes to the Center. Cynthia Parker–Kaback also testified credibly that the Center employed costumers and seamstresses and paid for the creation of sets and costumes. The notes to the financial statements in auditor's reports prepared by Lutz and Carr listed costumes among the items donated to the defendants.

Protas relies on a few of Graham's early tax returns which reported as expenses money spent on "costumes." Pease, however, testified credibly that although Graham might sometimes have advanced payment for costumes, "the Center went back and paid for them afterwards." With respect to the costumes designed and worn by Graham, the dance clothes manufactured by Danskin, and the Halston costumes given to Graham, plaintiff has not adequately identified these items or distinguished them from costumes that were donated to the defendants. Nor has he established that defendants are in possession of these items. Finally, Protas has not established that he demanded any of these items from the defendants, or that the defendants refused his demand. Accordingly, Protas is not entitled to replevin of those items.

Defendants have established by a preponderance of the credible evidence that some of their property is currently and unlawfully in plaintiff's possession. Marvin Preston testified credibly that a month before the trial, he found many trunks at plaintiff's warehouse labeled "Martha Graham Dance Company" which contained costumes. He was able to identify those costumes as the property of the Center by the label affixed to each of the costumes which indicated the name of the dance and the dancer it was created for. Preston also found at plaintiff's warehouse a cardboard box labeled "Halston clothes," which contained costumes with the same kind of labels. Finally, Preston also found two pieces of artwork each of which carried a label stating "this panel from the Wickes Collection is the property of the Martha Graham Center of Contemporary Dance, Inc." Photographs of the trunks, costumes, artwork, and Wickes collection labels were introduced at trial. Defendants are entitled to replevin the trunks containing costumes (including those made by Halston) and the artwork that they identified as possessed by Protas. Defendants have not, however, identified books and bibliographic materials or films and videotapes

owned by them that are in Protas' possession. Accordingly, they are not entitled to replevin those items.

## VII. Plaintiff's Replevin Claim with Respect to Other Personal Property

Plaintiff also seeks replevin of the following items: three Chinese moon viewing chairs; a Tibetan lama statue; several cases of videotapes of "Blood Memory"; videotapes made and paid for by Protas; four trunks of Protas' personal papers and clothing; two stands for "Frescoes" paid for by Graham; Max Waldman photographs given to Graham; historic floorboards from Studio One of 316 East 63rd Street; mirrors and bars from Studio One; IBM typewriter; drop leaf table; drafting table from Protas' old office at 316 East 63rd Street; photographs taken by Protas; Graham's vicuna throw; Georgia Sargeant's early 19th century sleigh bed and birthing rocker; Protas' 19th century wicker chaise; suitcases with personal effects; family photographs and paintings of Graham's family; low benches designed by Noguchi and given to Graham; and chairs of various heights commissioned by Bethsabee de Rothschild and designed by Noguchi for Graham.

Plaintiff has not established by a preponderance of the credible evidence that he owns any of the items at issue, or that they are currently in defendants' possession. Nor has he established a demand and refusal for any of the property at issue. The only evidence offered in support of this claim was plaintiff's own vague and contradictory testimony. All of the items listed have been insufficiently identified.

It was only after cross-examination that Protas attempted to ascertain whether he already had possession of the items he is claiming. He searched only five of the eight trunks in his own warehouse. After conducting the search, he testified that he found Georgia Sargeant's early 19th century sleigh bed in his own warehouse, and that he was withdrawing his claim for that item.

Protas also testified that he was not seeking return of properties that he had already sold to the Library of Congress. It is unclear, however, whether the several cases of "Blood Memory" that Protas seeks from defendants are the same as the "2–300 tapes of Blood Memory" that were sold by him to the Library of Congress. It is also unclear whether the photographs that Protas now claims he owns were among the photographs that he donated in December 1985 "for use of the Center." Nor has plaintiff identified which videotapes were paid for by him, and not the Center. For all the foregoing reasons, plaintiff has not established by a preponderance of the credible evidence his right to replevin any of the personal property he claims.

## VIII. Defendants' Breach of Fiduciary Duty Counterclaim

Defendants counterclaim for breach of Protas' fiduciary duty to the Center. They seek to impose a constructive trust on (1) $650,749 in proceeds that Protas received from licensing the ballets, sets, and costumes to third parties, and accumulated statutory interest of $351,404, and (2) at least $167,717 for items owned by the Center which Protas sold to the Library of Congress, and accumulated interest of $45,283. Defendants also contend that Protas should forfeit the salary he received during the last ten years of his employment by defendants, $34,743 in unpaid loans, and $235,000 that he received from the defendants in connection with the 1999 license agreement. Defendants seek prejudgment interest on all of those amounts.

"It is firmly established that the directors of a corporation have the fiduciary obligation to act on behalf of the corporation in good faith and with reasonable care so as to protect and advance its interests." *Pebble Cove Homeowners' Ass'n. v. Shoratlantic Dev. Co., Inc.*, 191 A.D.2d 544, 595 N.Y.S.2d 92, 93 (2nd Dep't 1993), *appeal dismissed*, 82 N.Y.2d 802, 604 N.Y.S.2d 559, 624 N.E.2d 697 (1993).

> The standard of care to which directors and officers of a not-for-profit corporation must subscribe is set out in Not-for-Profit Corporation Law ("N-PCL") § 717(a) which requires that they "discharge [their] duties … in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."

*S.H. and Helen R. Scheuer Family Found. Inc. v. 61 Assocs.*, 179 A.D.2d 65, 582 N.Y.S.2d 662, 664–65 (1st Dep't 1992). This formulation of the standard of care is an "expansion of the duty of the comparable section of the Business Corporation Law which does not contain the words 'care' and 'skill.'" *Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 186 Misc.2d 126, 715 N.Y.S.2d 575, 593 (Sup.Ct.N.Y.Cty., 1999)(internal citations omitted).

A preponderance of the credible evidence shows that Protas profited improperly at the defendants' expense and did not act "with an eye single to the interests" of the defendants to whom he owed a fiduciary duty. *See Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.1982). While he was the principal managerial employee and a board member at the Center, Protas' personal interests became his primary focus, interests that he himself recognized were in conflict with those of the Center.

In August of 1991, Protas wrote to Alex Racolin, a fellow board member, asserting uncorroborated factual statements regarding royalties paid to Graham for the ballets, sets, costumes, and dance films. Contrary to Protas' assertion that "past history always had the Center paying Martha a separate royalty for the use of the ballets in a film," Michele Etienne testified credibly that during her employment with the defendants, no royalties had been paid to Graham.

In particular, Protas' statements to Racolin that the Center had no rights in the dance films, including the PBS film and the NHK film, were misleading. Board minutes for 1984 show that Protas actively participated in discussions regarding the Center's receipt of payment for at least one PBS film—there is no mention of any royalties paid to Graham. Protas had personal knowledge of fees and royalties earned by the Center in connection with its ownership of that film.

With respect to the NHK film, Protas stated to Racolin that "it is my understanding that Martha allowed the use of the choreography only for the Danish American Showing, and only for the showing of the Japanese Film in Japan." The Center's 1990 agreement with NHK, a Japanese television network, assured to the Center "all broadcast rights outside of Japan," and "the rights to perform" the two taped dance programs that were the subject of the agreement. Protas, as General Director, represented the Center in that agreement.

In his desire to undermine the Center's ownership of the works, sets, and costumes, Protas did not accurately inform the board of the underlying facts, expecting instead that the directors would simply accept his statements. In his letter to Racolin, Protas stated that:

> I realize now that I should have been clear about all of this. There is some background correspondence but I will have to do an all out search for it if it is

really necessary. My feeling is that no one on the Board would object to an equitable arrangement. Of course one man's equity is another man's etc ...

Protas' assertions regarding ownership of the ballets, sets, and costumes were taken at face value by the defendants' board members who trusted him and believed that he was in the best position to know the facts.

A preponderance of the credible evidence shows that Protas also concealed from the Center that his attorneys had advised him to investigate what the "Estate actually owned and the status of the copyright registrations if any." Instead of investigating the nature and scope of his rights, Protas affirmatively represented to the Center's board that he "owned everything." In failing to undertake a thorough investigation regarding what he owned, concealing his uncertainty about Graham's copyright ownership at the time of her death, and affirmatively representing to the board that "he owned everything," Protas failed to exercise the "degree of diligence, care and skill" required of directors and officers of not-for-profit corporations.

"Moreover, it is well established that as fiduciaries, board members bear a duty of loyalty to the corporation and 'may not profit improperly at the expense of their corporation.'" *Scheuer,* 582 N.Y.S.2d at 665 (citations omitted). N–PCL § 715 provides that "if material facts as to [a] director's ... interest in [a] contract or transaction and as to any ... common directorship" are not "disclosed to in good faith or known to the board," a contract or transaction between a corporation and its director may be "avoided" unless the director can "establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was authorized by the board, a committee

or the members." The Center's copyrights in the dance films and the uncertainty regarding what the estate owned were facts that were "material" to Protas' interest in the license agreement with the Center, and were "material" to the interests of defendants.

Protas misrepresented to Racolin the extent of the Center's ownership rights in the dance films and failed to reveal to the board the uncertainty regarding his ownership of copyright in many of the dances. By representing to defendants that he "owned everything," Protas violated his duty of good faith and profited improperly at defendants' expense.

### Constructive Trust

"[A] constructive trust is a formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378 (1919)). Thus, "a constructive trust will be erected whenever necessary to satisfy the demands of justice .... [I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Id.* (citations omitted). The imposition of a constructive trust has been held to be an appropriate remedy for the diversion of a corporate opportunity. *See Poling Transp. Corp. v. A & P Tanker Corp.,* 84 A.D.2d 796, 443 N.Y.S.2d 895, 897 (2d Dep't 1981) ("If plaintiff can establish a diversion of corporate opportunity, the law will impress a constructive trust in favor of the corporation upon the property acquired.").

■ Under New York law, one who seeks to impose a constructive trust must establish the facts giving rise to that remedy by clear and convincing evidence. *Caballero v. Anselmo,* 759 F.Supp. 144, 147 (S.D.N.Y.1991); *Birnbaum v. Birnbaum,* 117 A.D.2d 409, 503 N.Y.S.2d 451, 455 (4th Dep't 1986). Four factors have been considered significant in determining whether equity should construct a trust: (1) the existence of a confidential or fiduciary relationship; (2) a promise express or implied; (3) a transfer in reliance on such a promise; and (4) unjust enrichment. *Crivaro v. Crivaro,* 743 N.Y.S.2d 513, 2002 WL 1180567 at *1 (2d Dep't 2002) (citing *Simonds v. Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)). The New York Court of Appeals has, however, recognized that "[a]lthough the[se] factors are useful in many cases, constructive trust doctrine is not rigidly limited." *Simonds,* 45 N.Y.2d at 241, 408 N.Y.S.2d 359, 380 N.E.2d 189.

■ There is clear and convincing evidence that a constructive trust should be imposed in this case. Protas, a longstanding fiduciary of the Center, "enriched [himself] unjustly by grasping" what did not belong to him. The defendants trusted him and relied on him to perform in good faith the high duty of loyalty of a fiduciary. Protas had a fiduciary duty not to appropriate to himself corporate opportunities that might belong to the defendants. *See Sharp v. Kosmalski,* 40 N.Y.2d 119, 122, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976) ("Even without an express promise, however, courts of equity have imposed a constructive trust upon property transferred in reliance upon a confidential relationship. In such a situation, a promise may be implied or inferred from the very transaction itself."); *Tordai v. Tordai,* 109 A.D.2d 996, 997, 486 N.Y.S.2d 802 (3d Dep't 1985).

Although plaintiff argues that damages are not recoverable without proof of proximate cause, under New York law, where "the remedy being sought is a restitutionary one to prevent the fiduciary's unjust enrichment as measured by his ill-gotten gain, the less stringent 'substantial factor' standard" is applicable. *Am. Fed. Group, Ltd. v. Rothenberg,* 136 F.3d 897, 908 n. 7 (2d Cir.1998); *LNC Inv., Inc. v. First Fidelity Bank,* 173 F.3d 454, 465 (2d Cir. 1999). Defendants seek a constructive trust for the purpose of compelling Protas to disgorge his "ill-gotten gain." Protas' conduct was a "substantial factor" in diverting corporate opportunities away from the defendants. He licensed defendants' dances, sets and costumes to third parties while concealing from the defendants the uncertainty regarding what he owned, and representing that he owned everything.

Defendants seek to impose a constructive trust on $650,749, the proceeds of 26 license agreements that Protas entered into with third parties between 1992 and 2000. With the exception of Maple Leaf Rag, most of the ballets licensed by Protas between 1992 and 2000 are either published works in which no party has established copyright ownership or works in the public domain. All of the costumes belong to the defendants, as do the pre–1957 Noguchi sets and all of the non-Noguchi sets.

Protas received license fees of $92,973 for property of the defendants: (1) $3,000 in costume royalties (1999 American Ballet Theatre agreement for Diversion of Angels); (2) $2,500 in costume royalties (1999 agreement with Ballet Teatro Argentino for Diversion of Angels); (3) $2,500 (1999 agreement with Ballet Teatro Argentino for Acts of Light); (4) $28,100 in license fees and ballet, costume and set royalties (1999 agreement with Ballet de Fundacao

for Maple Leaf Rag); (5) $5,371 [13] in costume royalties (1996 agreement with Ballet du Nord for Steps in the Street/Chronicle); (6) $2,000 in costume and set rental (1999 agreement with Boston Conservatory for Appalachian Spring); (7) $13,500 in costume and set rental fees and royalties (1998 agreement with Colorado ballet for Appalachian Spring); (8) $25,000 in ballet and costume royalties (1995 agreement with the Dutch National Ballet for a choice of 5 out of 10 ballets); (9) $2,000 in costume royalties (2000 agreement with Escola de Dança do Conveservatório Nacional for Diversion of Angels); (10) $2 in costume royalties (1998 agreement with Hartford Ballet for Acts of Light, Diversion of Angels and Lamentation); (11) $6,000 for sets and costumes (1999 agreement with Joffrey Ballet of Chicago for Appalachian Spring); and (12) $3,000 (2000 agreement with The Repertory Dance Theatre for Diversion of Angels). The sum of those fees is $92,973.

Defendants rely on a draft inventory of items listed for sale to the Library of Congress in seeking a constructive trust on the proceeds of that sale. The draft inventory is appended to a letter from Howell Begle, Protas' lawyer to the Library of Congress. The letter, which was copied to Protas, is dated March 27, 1998, a date that is very close to April 13, 1998, the date on which Protas executed the final agreement.

The Library of Congress appraisal clearly shows that Protas sold the defendants' files and two boxes of the defendants' business and financial records for $85,000 and $2,000 respectively. This money belongs to defendants. Defendants have not shown that any of the other items listed in the appraisal belonged to them.

■ The total proceeds from Protas' licensing and sale of defendants' property amount to $179,973. Defendants have not traced that amount to Protas' bank account. "It is hornbook law' that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." *United States v. Benitez,* 779 F.2d 135, 140 (2d Cir.1985). "In cases where the alleged res is money on deposit with a bank, the res must be traced to a specific account." *The Chase Manhattan Bank, N.A. v. Traditional Inv. Corp.,* 1995 WL 72410 at *3 (S.D.N.Y.1995) (citing *In re: Drexel Burnham Lambert Group, Inc.,* 142 B.R. 633, 636 (S.D.N.Y.1992)). Nonetheless, the New York Court of Appeals in *Rogers v. Rogers,* 63 N.Y.2d 582, 483 N.Y.S.2d 976, 473 N.E.2d 226 (1984) held that "[i]n general, it is necessary to trace one's equitable interest to identifiable property in the hands of the purported constructive trustee. But in view of equity's goal of softening where appropriate the harsh consequences of legal formalisms, in limited situations the tracing requirement may be relaxed." *Id.* at 586, 483 N.Y.S.2d 976, 473 N.E.2d 226 (internal citations omitted). *See also Simonds,* 408 N.Y.S.2d at 362, 380 N.E.2d 189 ("inability to trace plaintiff's equitable rights precisely should not require that they not be recognized"). The equities in this case support relaxing the tracing requirement in favor of defendants.

■ Under New York law, a party prevailing on a claim of breach of fiduciary duty is entitled to prejudgment interest.

---

**13.** This amount was calculated by converting French francs to U.S. dollars by using the average exchange rate for 1996, i.e., 5.12 francs per dollar. *See* Federal Reserve Statistical Release G.5A–January 7, 1997, http://www.federalreserve.gov/releases/g5a/19970107.

*Gibbs v. Breed, Abbott & Morgan,* 181 Misc.2d 346, 693 N.Y.S.2d 426 (Sup.Ct. N.Y.Cty. 1999), *rev'd on other grounds,* 279 A.D.2d 887, 720 N.Y.S.2d 578 (1st Dep't 2001); *see generally,* N.Y.C.P.L.R. 5001(a) ("Interest shall be recovered upon a sum awarded because of . . . an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of property . . . ."). Defendants are entitled to prejudgment interest at nine percent per annum on $92,973 and $87,000 of proceeds from the licensing of their property and from the sale of their property to the Library of Congress respectively. *See* N.Y.C.P.L.R. 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."). Since most of the license agreements at issue were executed in 1999, January 1, 1999 is a "reasonable intermediate date" from which nine percent interest on $92,973 may be calculated. *See* N.Y.C.P.L.R. 5001(b). Prejudgment interest on $87,000 worth of defendants' property sold to the Library of Congress may be calculated from September 1, 1998, the date of purchase.

Defendants also seek to impose a constructive trust on $235,000 which they paid to Protas in connection with the 1999 license agreement. According to the agreement, this money was repayment for a debt owed to Protas by the Center. Although defendants counterclaim for that money and argue about its purpose, there was no evidence at trial concerning the nature of the debt. Next, defendants counterclaim for sums borrowed by Protas from the Center on three occasions. There is no evidence that those loans were not repaid. Defendants also seek to recover all of the compensation they paid to Protas during the period of his self-dealing disloyalty. At oral argument, defendants stated that this was a discretionary reme-

dy. Breach of fiduciary duty is an equitable claim, and the extreme remedy of forfeiture of salary is not appropriate in this case. *Cf. Aramony v. United Way of America,* 28 F.Supp.2d 147 (S.D.N.Y.1998).

Finally, defendants assert counterclaims of fraud and negligent misrepresentation against Protas. The measure of damages for misrepresentation is out-of-pocket loss. *See Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). There is no evidence of out-of-pocket loss incurred by defendants.

## CONCLUSION

For the foregoing reasons, plaintiff is entitled to a declaration of ownership for the renewal term of copyright in Seraphic Dialogue. Defendants are entitled to a declaration of ownership of copyright in the following 45 dances: Tanagra, Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul is a Circus, El Penitente, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Eye of Anguish, Ardent Song, Embattled Garden, Episodes: Part I, Acrobats of God, Phaedra, Secular Games, Legend of Judith, The Witch of Endor, Part Real–Part Dream, Cortege of Eagles, Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Lucifer, The Scarlet Letter, O Thou Desire Who Art About to Sing, Shadows, The Owl and the Pussycat, Ecuatorial, Frescoes, Judith (created in 1980), Andromache's Lament, Phaedra's Dream, Song, Tangled Night, Persephone, Maple Leaf Rag, and The Eyes of the Goddess. *See Summary Table.*

Neither side has established ownership of copyright in 24 dances. *See id.* Of those 24 dances, ten works, two of which were commissioned, are in the public do-

main: Flute of Krishna, Heretic, Lamentation, Celebration, Frontier, Panorama, Chronicle/Steps in the Street, American Document, Appalachian Spring, and Night Journey. Five of the 24 dances are commissioned works: Herodiade, Dark Meadow, Cave of the Heart, Judith (created in 1950), and Canticle for Innocent Comedians. The remaining nine dances have been published, but neither side has shown whether any of those dances were published with adequate notice of copyright. Those nine dances are: Errand into the Maze, Diversion of Angels, Clytemnestra, Circe, Adorations, Acts of Light, The Rite of Spring, Temptations of The Moon, and Night Chant.

Defendants are entitled to a declaration of ownership of the original Noguchi sets and jewelry accompanying the ballets created by Graham prior to January 15, 1957. Neither side is entitled to a declaration of ownership with respect to the original No-guchi sets and jewelry accompanying ballets created after January 15, 1957. Defendants are entitled to a declaration of ownership of all of the remaining sets and costumes for the dances. Plaintiff is directed to return to the defendants the costumes and artworks identified by the defendants as in his possession.

Finally, defendants are entitled to a constructive trust to recover $92,973 of proceeds from plaintiff's licensing of their property plus prejudgment interest on that amount at nine percent per annum computed from January 1, 1999. They are also entitled to a constructive trust to recover from plaintiff $87,000 of proceeds from the sale of their property to the Library of Congress plus prejudgment interest on that amount computed from September 1, 1998. Settle judgment on three days' notice.

SO ORDERED.

SUMMARY TABLE: COPYRIGHT OWNERSHIP IN 70 DANCES CHOREOGRAPHED BY GRAHAM THAT EXIST IN FIXED FORM